IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALLISA D. GAY,<br><br>    *Plaintiff,*<br><br>v.<br><br>A.O. SMITH CORPORATION, *et al.*,<br><br>    *Defendants.* | Civil Action No. 2:19-cv-1311<br><br>Hon. William S. Stickman IV |

**MEMORANDUM OPINION**

WILLIAM S. STICKMAN IV, United States District Judge

    Plaintiff Allisa D. Gay ("Plaintiff") sued Defendant, Flowserve U.S., Inc., successor in interest to Durametallic Corp., and various manufacturers and distributors on October 8, 2019 in the Court of Common Pleas of Allegheny County, Pennsylvania and alleged that Decedent Carl E. Gay ("Decedent") developed mesothelioma from exposure to Defendant's asbestos-containing products. On October 11, 2019, Defendant General Electric Co. filed a Notice of Removal to the United States District Court for the Western District of Pennsylvania under 28 U.S.C. § 1446. Before the Court is Defendant's Motion for Summary Judgment. (ECF No. 884). The Court must determine whether Plaintiff has properly identified Defendant's product as a cause of Mr. Gay's disease and, ultimately, death. For the following reasons, Defendant's Motion is granted.

    **I.**    **Background**

    This case involves an alleged asbestos-related injury because of Mr. Gay's employment in the United States Navy from 1946 to 1958, the United States Air Force from 1958 to 1967, General Electric Co. from 1967 to 1974, Stone and Webster from 1974 to 1989 and from his automotive

work starting in the 1940s. (*See* ECF Nos. 1-1; 1-2). Mr. Gay was diagnosed with mesothelioma in June 2019. (ECF No. 1-15, ¶ 165; ECF No. 675).

Mr. Gay was deposed over nine days—November 5–7, 11–13, 21–22, 25, 2019—and identified various manufacturers, suppliers and users of asbestos products. Mr. Gay died on April 12, 2020. (ECF No. 1-15, ¶ 165; ECF No. 675). His daughter, Allisa D. Gay, was named executor of her father's estate and filed an Amended Complaint on August 13, 2020. (ECF No. 692). Allisa Gay was substituted as Plaintiff. (*Id.*).

## II.  Relevant Facts

Plaintiff alleges that Mr. Gay developed mesothelioma from exposure to asbestos fibers from Defendant's products. Mr. Gay recalled three potential exposures to Durametallic products: while working at Naval Air Facility Adak in the Aleutian Islands, Alaska; while serving as an engineman aboard the USS Seawolf; and while working at SM-1 facility in Ft. Belvoir, Virginia. In his deposition, Mr. Gay thought he recalled Durametallic during his time in Alaska.

```
                                92
17    Q. Okay.  Other than Garlock gaskets, do you
18       associate any other manufacturer with any of the gaskets
19       that you used at the Adak base?
20    A. It seemed like we had Dura- — Durametallic.
21       I think that was the name of it.
22    Q. Okay.  Do you—what do you associate with
23       that name, Durametallic?
24    A. Just a gasket.  I can't—
                                93
 1    Q. Was—was it used for a particular
 2       application?
 3    A. Any?  It was like Garlock.  You used it
 4       where you needed it.
 5    Q. Okay.  Would you have handled those
 6       Durametallic gaskets in the same manner that you
 7       described for us earlier?
```

    8      A. Yes.

(ECF No. 957-2, p. 2). Later in his deposition, Mr. Gay discussed Durametallic products as they related to his time at the SM-1 facility.

```
                             158
7    Q. The SM-1, you were there from 1958 to '61
8       and then from '64 to '67?
9    A. Yes.
***
                             180
9    Q. Would the gaskets have been handled in the
10      same way that you described for us?
11   A. Yes, and looked the same.
12   Q. Do you associate any manufacturer name with
13      the gaskets that you observed at the SM-1 facility?
14   A. Garlock, Flexitallic, maybe Durametallic.
15      That's all that comes to mind now.
```

(ECF No. 957-2, pp. 3, 4). In talking about his experience at the SM-1 facility, Mr. Gay provided the following testimony:

```
                             26
23   Q. Okay. I also want to ask you a little bit
24      about—a little bit more about the SM-1 because I
                             27
1       don't think that you fully explained how—how much of
2       your work was hands-on as opposed to supervisory. So
3       can you just explain that a little bit more? How much
4       of the maintenance work did you actually perform
5       yourself?
6    A. Well, I first got there as an equipment
7       operator. I performed maintenance at all times when
8       needed, and as I progressed up the chain into a reactor
9       operator and shift supervisor, the maintenance became
10      less. But then I went into maintenance itself as a
11      supervisor and right back into supervising maintenance
12      and performing maintenance myself.
***
14   Q. Okay. Was it something you did on a—on a
15      weekly or a monthly basis during your time at the SM-1?
16   A. I would say that it was no real schedule.
17      If you—if you have a class that's coming through, you
18      know, the class is going to be there a few—a few
19      months. Anything that you're going to demonstrate to
```

```
20         them, it's going to go—you hope they get it the first
21         time so you're not going to have to go through it again.
22         So you look at it like that, it would be probably in the
23         neighborhood of a few months that you would do this.
24    Q.   Okay. So every few months you would take
                              29
1          pieces of equipment apart to demonstrate for classes
2          that were coming through?
3     A.   (Witness nods head.)
4     Q.   That—that's right?
5     A.   Yes.
***
18    Q.   When we were talking about the SM-1 facility
19          yesterday, you mentioned that there was a—a document
20          that you referred to, the—the maintenance procedures.
21          I believe you talked about that yesterday.
22    A.   Right.
23    Q.   Do you know who—what—what entity
24          published that particular document?
                              30
1     A.   I believe it was the Army that published it.
2          I'm sure it had the approval of Alco, but I think it was
3          published under—at that time it was the APPR-1.
4     Q.   Okay.
5     A.   I think that was the Army Power Package
6          Reactor System [sic].
7     Q.   Did Alco's name appear on the document?
8     A.   Yes, I believe it did.
```

(ECF No. 957-3, p. 2).

Documents from university archives show that the SM-1 plant, designed by ALCO, included Durametallic B-71 as an example of possible packing that workers could use in certain pumps at the plant. (ECF No. 957-5, p. 5). The U.S. Army, in cooperation with ALCO, published the document. (*Id.*).

On one day of his deposition, Mr. Gay testified about his experience aboard the USS Seawolf between March 1957 and June 1958. Aboard the submarine, he repacked leaky valves. (ECF No. 957-4, p. 2).

```
21    Q. Okay. Do you know if on the Seawolf during
22       that period of time, March of '57 to June of '58, you
23       would use the packing of any other manufacturers other
24       than John Crane?
                           123
 1    A. Specifically, no, but I'm—I believe that
 2       we also had Anchor, perhaps Durametallic, but . . .
 3    Q. Okay. Perhaps Anchor packing on the
 4       Seawolf?
 5    A. Perhaps.
```

(*Id.* at 5).

During cross-examination, Mr. Gay was asked about his experience with Durametallic and provided this recollection:

```
                           167
15    Q. Okay. Do you recall [Durametallic] being present at any
16       of the—you know, on any of the vessels or any of the
17       various job sites that—which you've worked over your
18       career?
19    A. I believe—I remember seeing it at the
20       SM-1.
21    Q. Okay. Anyplace else that you remember?
22    A. No.
```

(*Id.* at 6).

### III.    Standard of Review

Summary judgment is warranted if the Court is satisfied that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 322 (1986). A fact is material if it must be decided to resolve the substantive claim or defense to which the motion is directed. In other words, there is a genuine dispute of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must view the evidence presented in the light most favorable to the nonmoving party. *Id.* at 255. It refrains from making credibility determinations or weighing evidence. *Id.* "Real questions about

credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof" will defeat a motion for summary judgment. *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007).

## IV. Applicable Law

### A. The Court Will Apply Pennsylvania Law.

The parties agree that Pennsylvania substantive law applies. For that reason, the Court will apply Pennsylvania law. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938); *see also Guar. Trust Co. v. York*, 326 U.S. 99, 108 (1945).

### B. Causation Standard

Before imposing liability on a defendant in a product liability action, Pennsylvania law requires a plaintiff to show not only that the plaintiff was exposed to a defective product manufactured or sold by the defendant but that the plaintiff's exposure was a substantial factor in causing the plaintiff's injury. *Richards v. Raymark Indus. Inc.*, 660 F. Supp. 599 (E.D. Pa. 1987); *Gregg v. V-J Auto Parts Co.*, 943 A.2d 216, 224–26 (Pa. 2007); *accord Robertson v. Allied Signal Inc.*, 914 F.2d 360, 375 (3rd Cir. 1990) (applying Pennsylvania law). The Pennsylvania Supreme Court held in asbestos litigation that "it is appropriate for courts, at the summary judgment stage, to make a reasoned assessment concerning whether, in the light of the evidence concerning frequency, regularity, and proximity of a plaintiff's or decedent's asserted exposure, a jury would be entitled to make the necessary inference of a sufficient causal connection between defendant's product and the asserted injury." *Gregg*, 943 A.2d at 226–27 (adopting the frequency, regularity and proximity standard in asbestos cases). As a result, a plaintiff must prove he was exposed to asbestos from a defendant's product with sufficient frequency, regularity and proximity so that a jury could make the necessary inference of an adequate causal connection between that product and the asserted injury. *Id.* at 227.

As for proximity, a plaintiff cannot merely show that the product was present at the plaintiff's workplace; he must present evidence to establish that the plaintiff inhaled asbestos fibers of the specific product of a manufacturer. *Kardos v. Armstrong Pumps, Inc.*, 222 A.3d 393, 399 (Pa. Super. 2019); *Gutteridge v. A.P. Green Services, Inc.*, 804 A.2d 643, 652 (Pa. Super. 2002), *appeal denied*, 829 A.2d 1158 (2003).

## V.   ANALYSIS

Defendant moves for summary judgment because it is not liable for injuries caused by asbestos products because Plaintiff has not properly identified Defendant's products. (ECF No. 871, p. 2). Defendant argues that Plaintiff failed to produce sufficient evidence to satisfy her burden of showing that Mr. Gay was exposed to asbestos fibers of any product manufactured, distributed or supplied by Defendant. (*Id.*).

"At the heart of an asbestos case is at least product identification—that is, a plaintiff cannot triumph against a manufacturer unless he shows that the victim came across the manufacturer's product and that the product caused his injury." *Mehnert v. Agilent Techs., Inc.*, No. CV 18-893, 2020 WL 1493542 (W.D. Pa. Mar. 27, 2020) (quoting *Walker v. Blackmer Pump Co.*, 367 F. Supp. 3d 360, 372 (E.D. Pa. 2019)). Such an inquiry is "fact-intensive." *Id.*

For Plaintiff to defeat Defendant's Motion for Summary Judgment, Plaintiff must show not only that Mr. Gay was exposed to asbestos-containing products with sufficient proximity, regularity and frequency to cause his injuries but also that the asbestos products to which Plaintiff claims exposure were manufactured, distributed or sold by Defendant. *Eckenrod v. GAF Corp.*, 544 A.2d 50, 53 (Pa. Super. 1988); *see also Wilson v. A.P. Green Indus.*, 807 A.2d 922, 924 (Pa. Super. 2002) ("Ideally, a plaintiff or a witness will be able to directly testify that plaintiff breathed in asbestos fibers and that those fivers came from defendant's product."). The Court has a "duty

to prevent questions from going to the jury which would require it to reach a verdict based on conjecture, surmise, guess or speculation." *Krauss v. Trane*, 104 A.3d 556, 568 (Pa. Super. 2014) (citation omitted).

### A. Plaintiff Failed to Show Mr. Gay Was Exposed to Asbestos from Defendant's Products Aboard the USS Seawolf or at the Adak Naval Air Facility.

Plaintiff has not supplied evidence that Mr. Gay worked around Defendant's products containing asbestos aboard the USS Seawolf or at the Adak Naval Air Facility. Mr. Gay's affidavit provides a broad description of gaskets, packing and the manufacturers of those products that Mr. Gay encountered during his career. (*See* ECF No. 957-1). Mr. Gay's affidavit does not describe specifically where, when or how he encountered Defendant's products. *Id.* The only specific recollection Mr. Gay offered during his sworn testimony was that he thought he saw Durametallic at the SM-1 Facility in Ft. Belvoir, Virginia. (*See* ECF No. 968-1).

Defendant contends that Plaintiff's arguments rest on mere speculation. It notes that Mr. Gay only thought he recalled Durametallic at SM-1. (ECF No. 957-4, p. 6).

```
                              167
15     Q.  Okay.  Do you recall [Durametallic] being present at any
16         of the—you know, on any of the vessels or any of the
17         various job sites that—which you've worked over your
18         career?
19     A.  I believe—I remember seeing it at the
20         SM-1.
21     Q.  Okay.  Anyplace else that you remember?
22     A.  No.
```

(*Id.* at 6). His answers regarding his time in Alaska and aboard the USS Seawolf were even more speculative.

```
                               92
17     Q.  Okay.  Other than Garlock gaskets, do you
18         associate any other manufacturer with any of the gaskets
19         that you used at the Adak base?
20     A.  It seemed like we had Dura- — Durametallic.
21         I think that was the name of it.
```

```
22      Q. Okay. Do you—what do you associate with
23         that name, Durametallic?
24      A. Just a gasket. I can't—
                                    93
1       Q. Was—was it used for a particular
2          application?
3       A. Any? It was like Garlock. You used it
4          where you needed it.
5       Q. Okay. Would you have handled those
6          Durametallic gaskets in the same manner that you
7          described for us earlier?
8       A. Yes.
9       MS. COCHRAN: Objection to form. Leading.
```

(ECF No. 957-2, p. 2). When asked if he could recall other packing products in connection to his service aboard the USS Seawolf, Mr. Gay responded, "Specifically, no, but I'm—I believe that we also had Anchor, perhaps, Durametallic, but . . . ." (ECF No. 957-4, p. 5).

"A plaintiff cannot survive summary judgment when mere speculation would be required for the jury to find in the plaintiff's favor." *Krauss*, 104 A.3d at 558 (citing *Juliano v. Johns-Manville Corp.*, 611 A.2d 238, 239 (Pa. Super. 1992)). Mr. Gay did not testify about his presence around anyone who was cutting, removing, installing or manipulating Durametallic packaging. (ECF No. 957-1). He did not testify to manipulating or cutting the material himself. (*Id.*). Mr. Gay did not testify to inhaling respirable dust from a Durametallic product. (*Id.*). The Court holds that Plaintiff's evidence on Mr. Gay's potential exposure to Durametallic products at the base in Alaska and aboard the USS Seawolf does create a genuine issue of material fact.

### A. Plaintiff Failed to Establish a Genuine Issue of Material Fact for Mr. Gay's Exposure to Defendant's Product at the SM-1 Facility.

Defendant acknowledges that, ultimately, the record shows that it may have supplied some asbestos-containing products to certain locations that Mr. Gay worked during his career, but it does not show if these products were ever used or installed, where they were used, if any maintenance was performed on them or if Mr. Gay was present during this effort. (ECF No. 968, p. 4). Mr.

Gay did not testify that he was near any person installing, removing or manipulating Durametallic packing. (*Id.*). Plaintiff contends that Mr. Gay was around workers when they packed valves at the SM-1 facility. (ECF No. 957, p. 3). Plaintiff also argues that Durametallic packing products were present at the facility by quoting SM-1's operating manual. The language of the manual reads: "Put in one ring of lead foil packing (Durametallic B-71, for example) followed by four or five rings of plastallic packing and then another ring of lead foil." The document listed Duramatellic as an example of foil packing that would be allowed. (ECF No. 957-5, p. 5).

Simply establishing that a defendant's product was merely present at a plaintiff's place of work is insufficient. *Lindstrom v. A-C Prod. Liability Trust*, 424 F.3d 488, 492 (6th Cir. 2005) (quoting *Stark v. Armstrong World Indus., Inc.*, 21 F. App'x 371, 376 (6th Cir. 2001)) (internal citation omitted). Instead, the plaintiff must show "a high enough level of exposure that an inference that the asbestos was a substantial factor in the injury is more than conjectural." *Abbay v. Armstrong Int'l Inc.*, No. 10-01585, 2012 WL 975837, at *1 n.1 (E.D. Pa. Feb. 29, 2012) (quoting *Lindstrom*, 424 F.3d at 492). A "[t]otal failure to show that the defect caused or contributed to the accident will foreclose as a matter of law a finding of strict products liability." *Stark*, 21 F. App'x at 376 (citations omitted). Neither the manual nor Mr. Gay's deposition definitively place Durametallic products near Mr. Gay while working at the SM-1 facility. A plaintiff in an asbestos products liability case must show not only that a defendant's product was present in the workplace but also that the plaintiff worked with or around the product's use. *Krauss*, 104 A.3d at 563 (Pa. Super. 2014) (citing *Eckenrod*, 544 A.2d at 52).

The Court holds that a factfinder could not find for Plaintiff without making several inferential leaps. *See Liberty Lobby*, 477 U.S. at 248. Plaintiff has not proffered enough evidence

to show that Defendant's products were a substantial factor in Mr. Gay's mesothelioma. The Court grants Defendant's Motion for Summary Judgment.

### VI.    Conclusion

The Court finds no genuine issue of material fact exists as for Mr. Gay's alleged exposure to asbestos from Defendant's products. As a result, Defendant's Motion for Summary Judgment is granted. Orders of Court will follow.

BY THE COURT:

_____
WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

4-26-21
Dated