IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALLISA D. GAY,<br><br>      *Plaintiff,*<br><br>v.<br><br>A.O. SMITH CORPORATION, *et al.*,<br><br>      *Defendants.* | Civil Action No. 2:19-cv-1311<br><br>Hon. William S. Stickman IV |

**MEMORANDUM OPINION**

WILLIAM S. STICKMAN IV, United States District Judge

  Plaintiff Allisa D. Gay ("Plaintiff") sued Defendant Honeywell Inc. ("Honeywell") and various manufacturers and distributors on October 8, 2019 in the Court of Common Pleas of Allegheny County, Pennsylvania and alleged that Decedent Carl E. Gay ("Decedent") developed mesothelioma from exposure to Honeywell's asbestos-containing products. On October 11, 2019, Defendant General Electric Co. filed a Notice of Removal to the United States District Court for the Western District of Pennsylvania under 28 U.S.C. § 1446. Before the Court is Honeywell's Motion for Summary Judgment. (ECF No. 852). The Court must determine whether Plaintiff properly identified Honeywell's product as a cause of Mr. Gay's disease and, ultimately, death. For the following reasons, Honeywell's Motion is granted.

  **I.**  **Background**

  This case involves an alleged asbestos-related injury because of Mr. Gay's employment in the United States Navy from 1946 to 1958, the United States Air Force from 1958 to 1967, General Electric Co. from 1967 to 1974, Stone and Webster from 1974 to 1989 and from his automotive

1

work starting in the 1940s. (*See* ECF Nos. 1-1; 1-2). Mr. Gay was diagnosed with mesothelioma in June 2019. (ECF No. 1-15, ¶ 165; ECF No. 675).

Mr. Gay was deposed over nine days—November 5–7, 11–13, 21–22, 25, 2019—and identified various manufacturers, suppliers and users of asbestos products. Mr. Gay died on April 12, 2020. (ECF No. 1-15, ¶ 165; ECF No. 675). His daughter, Allisa D. Gay, was named executor of her father's estate and filed an Amended Complaint on August 13, 2020. (ECF No. 692). Allisa Gay was substituted as Plaintiff. (*Id.*).

## II.     Relevant Facts

Plaintiff alleges that Mr. Gay developed mesothelioma from exposure to Honeywell's asbestos-containing products while working at the SM-1 facility in Virginia and the PM-1 facility in Wyoming. Plaintiff believes Mr. Gay was exposed to asbestos from Honeywell products including controls, valves and instruments. Mr. Gay maintained the valves and equipment at both facilities on an as-needed basis.

Mr. Gay worked at the SM-1 facility in Ft. Belvoir, Virginia as a maintenance worker from 1958 to 1961 and again from 1964 to 1967. He worked with various equipment including pumps, valves, switchgear and instruments. (ECF No. 955-1, ¶ 19). Mr. Gay also worked at the PM-1 facility in Sundance, Wyoming from 1961 to 1964. He recalled Honeywell valves and controls at this facility. He also worked near others who installed gaskets, packing and heat insulation. (*Id.* ¶ 20).

Generally, when repairing valves, Mr. Gay had to remove old gaskets from valve flanges, and valve packing glands. He typically removed gaskets with a wire brush, and this created dust that he breathed. He typically removed the packing with a packing puller or another tool, and this created dust which he breathed. Other workers in his vicinity followed the same procedures, and

Plaintiff alleges Mr. Gay was exposed to and breathed dust because of their work as well. (*Id.* ¶ 15).

Mr. Gay testified that he recalled Honeywell controls at the SM-1 facility. (ECF No. 955-2).

```
                                    174
18    Q. So there were instruments and controls in
19       the facility?
20    A. Yes.
21    Q. Do you associate any manufacturer name with
22       any of those?
23    A. I think all of our instrumentation was
24       Honeywell.
                                    175
 1    Q. Did you ever have to perform any maintenance
 2       work on any of the instrumentation?
 3    A. No—
 4    Q. Did other work—
 5    A. —I didn't.
 6    Q. Did—did other workers in your vicinity do
 7       that?
 8    A. Yes.
 9    Q. Did some of the workers that you supervised
10       do that work?
11    A. Yes.
12    Q. What sorts of maintenance work did you
13       observe others doing on the instruments?
14    A. Calibration, cleaning, blowing the dust out
15       of them. When you say instruments, you know, we're
16       talking about panels, sometimes, that has a number of
17       instruments on it. Or maybe it's just one big box with
18       controls on it. A recorder, for instance.
                                  * * *
                                    176
12       You said that you associated the name
13       Honeywell with those controls?
14    A. Yes.
15    Q. How do you associate that name with—
16    A. Name on it.
17    Q. What were those controls and sensors, what
18       were they connected to out in the plant?
19    A. Everything from feedwater control . . .
```

(*Id.*).

Days later, Mr. Gay testified about Honeywell controls and equipment during his work at the SM-1 facility and PM-1 facility. (ECF No. 955-4).

```
                              69
17   Q. Was this the only Honeywell recorder that
18      you recall at the SM-1 nuclear power plant?
19   A. No. We had—oh, recorder?
20   Q. Yeah. I'm just talking about the recorder
21      right now.
22   A. I don't know that. We had a lot of
23      Honeywell equipment—
24   Q. Okay.
                              70
 1   A. —and I'm—I think that the majority of
 2      the recorders that was built into the Honeywell panels
 3      were Honeywell recorders.
                             * * *
                              73
                             * * *
10   Q. So would it be safe to say that you never
11      saw any maintenance work being performed on these other
12      pieces of Honeywell equipment at the SM-1 facility?
13   A. There was maintenance work performed on
14      them, but as to what it was, I don't know. All I seen
15      was the doors open.
16   Q. Okay.
17   A. Instrument techs doing something.
18   Q. I gotcha.
```

(*Id.*).

As for his experience at the PM-1 facility, Mr. Gay provided the following testimony:

```
                              83
                             * * *
15   Q. That's right. We did talk about that.
16      Now, before I move in to Honeywell valves—
17      move on to Honeywell valves, there's a reference to
18      Honeywell controls there. You didn't identify during
19      your deposition—during your direct examination by
20      your counsel any Honeywell controls at the PM-1 nuclear
21      power plant, but in your affidavit you do identify
22      Honeywell controls.
23   A. I believe that our control room did have
24      Honeywell controllers in them.
                              84
```

| | |
|---|---|
| 1 | Q. Okay. And in the control room at PM-1? |
| 2 | A. Yes. |

* * *

| | |
|---|---|
| 11 | Q. Okay. And—and just like the—the |
| 12 | Honeywell instruments at SM-1, you didn't personally |
| 13 | work on any Honeywell controls at PM-1. |
| 14 | A. No. |
| 15 | Q. Am I right? |
| 16 | A. No. Once again, it was instrumentation |
| 17 | people. |

* * *

86

| | |
|---|---|
| 7 | Q. Okay. And would I be correct in saying that |
| 8 | you don't have any personal knowledge that any of the |
| 9 | Honeywell controls at PM-1 in Sundance, Wyoming, |
| 10 | contained asbestos? |
| 11 | A. That's true, I do not. |
| 12 | Q. And would my statement be correct that you |
| 13 | don't have a specific recollection of working around |
| 14 | others performing any maintenance on any Honeywell |
| 15 | controls at the PM-1 nuclear power plant? |
| 16 | A. I was around them when maintenance was |
| 17 | performed. In the control room at the PM-1, they would |
| 18 | come in, they would do check, pull out the in-— |
| 19 | instrumentation sections. . . . |

* * *

92

* * *

| | |
|---|---|
| 15 | Q. All right. So in the second sentence of |
| 16 | that paragraph talking about the pieces of equipment you |
| 17 | worked at PM-1, you mentioned Honeywell valves. And |
| 18 | during your—during the direct examination conducted |
| 19 | by your counsel, you never identified Honeywell as a |
| 20 | manufacturer of any valves. And I want to ask you why |
| 21 | have you made reference to Honeywell valves in your |
| 22 | affidavit, specifically in paragraph 20? |
| 23 | A. When I wrote this, that was—at that time, |
| 24 | I believe that I had seen Honeywell valves. |

93

| | |
|---|---|
| 1 | Q. Okay. |
| 2 | A. When we were discussing at deposition, it |
| 3 | didn't come up, and, frankly, I couldn't tell you |
| 4 | exactly where I seen the Honeywell valves. |
| 5 | Q. Okay. I'm going to ask you a few questions |
| 6 | about the Honeywell valves. Okay? |
| 7 | A. Well, the ones I don't remember. |

```
8      Q. Okay. Well, we'll just—we'll confirm
9         that. Okay?
10        How is it that you associate the name
11        Honeywell with valves, then, at—at PM-1?
12     A. I think they were part of our control
13        valves.
14     Q. So you would identify Honeywell valves as
15        being control valves?
16     A. Yes.
```
94
* * *

```
11        Did you know how it was operated? Did it
12        have a handle? Or did any of these Honeywell control—
13     A. I think all of them were remote control.
14     Q. Remote. Do you recall the location
15        specifically at PM-1 of any Honeywell control valve?
16     A. No, I do not.
17     Q. And, again, would I be correct in saying
18        that you did not personally work on any Honeywell
19        control valve at PM-1?
20     A. Not that I remember specifically, no.
```
* * *
96

```
16     Q. I understand. Would I be correct in saying
17        that you wouldn't know how a Honeywell control valve was
18        connected to any pipe in terms of whether it was
19        threaded, welded, or flanged? Or am I wrong? Do you
20        recall that?
21     A. No, I don't recall it, but it was
22        undoubtedly flanged.
23     Q. Why do you say that?
24     A. Most valves were flanged. A control valve
```
97

```
1         especially would be flanged so if something went out,
2         you—went wrong, you could take it out.
```
* * *

```
22     Q. Okay. So you wouldn't be able to tell me
23        whether there was any asbestos-containing components or
24        parts associated with the Honeywell control valve,
```
98

```
1         correct?
2      A. That's correct, except if it was flanged, it
3         would have been—would have had gaskets on it.
4      Q. And you said "if," but you don't know
5         specifically if a Honeywell control valve was flanged?
```

6

6 A. Specifically, no.

(ECF No. 955-4, pp. 4, 6, 7, 8).

In discovery responses filed by Honeywell in an unrelated case, Honeywell disclosed that some control valves used asbestos-containing internal gaskets or packing. Honeywell used internal gaskets and packing supplied by others. (ECF No. 955-5, pp. 2–3).

Honeywell, through its discovery responses from separate litigation, stated that it "marketed and sold insulated thermocouple wire and thermocouple extension wire." Further, "part of the insulation on some of the wire is believed to be braided chrysotile asbestos" from before 1950 through the early 1980s. Honeywell also manufactured controls with asbestos-containing phenolic molding compounds from before 1960 through the early 1980s. (ECF No. 955-8).

A corporate representative of Honeywell, Michael Chunko, testified in other litigations that some Honeywell control valves contained asbestos up until 1983. He testified that gaskets containing crocidolite asbestos fibers were used in some control valves used in acidic or corrosive conditions. Mr. Chunko stated that Honeywell did not provide an asbestos health warning along with Honeywell products. Mr. Chunko also testified that Honeywell never took air samples of asbestos released during the removal of gaskets from control valves. (ECF No. 955-7, pp. 2–4, 5–6, 7–8); (*see generally* ECF No.955-8).

### III. Standard of Review

Summary judgment is warranted if the Court is satisfied that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 322 (1986). A fact is material if it must be decided to resolve the substantive claim or defense to which the motion is directed. In other words, there is a genuine dispute of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must

view the evidence presented in the light most favorable to the nonmoving party. *Id.* at 255. It refrains from making credibility determinations or weighing evidence. *Id.* "Real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof" will defeat a motion for summary judgment. *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007).

## IV. Applicable Law

### A. Virginia and Pennsylvania Law Apply

Honeywell argues that Virginia substantive law applies. Plaintiff did not respond to Honeywell's argument. Federal jurisdiction here stems from the diversity of citizenship under 28 U.S.C. § 1332. The alleged exposures relevant to this motion occurred in Virginia and Wyoming.

In cases brought under diversity jurisdiction, the Court applies Pennsylvania's choice-of-law rules. *See Pac. Employers Ins. Co. v. Global Reinsurance Corp. of Am.*, 693 F.3d 417, 432 (3d Cir. 2012). Under Pennsylvania choice-of-law rules, the Court must first determine whether the issues present an actual conflict between the laws of the states involved. *Hammersmith v. TIG Ins. Co.,* 480 F.3d 220, 229–30 (3d Cir. 2007). If they do not, the Court ends its analysis: the states' laws are interchangeable. *Id.* If a conflict is present, then the Court must determine whether the conflict is a true or false conflict or an unprovided-for-situation. *Id.* at 230. If it is a false conflict, "only one jurisdiction's governmental interests would be impaired by the application of the other jurisdiction's laws," and the law of the state with a true interest applies. *Id.* at 229–30 (quoting *Lacey v. Cessna Aircraft Co.,* 932 F.2d 170, 187 (3d Cir.1991)). In an unprovided-for situation, when neither state has an interest, the Court will apply traditional choice-of-law rules based on the action in the case. *Id.* at 230 n.9. If the case presents a true conflict, then the Court moves to the third step and must find which state has the greater contacts and greater interest in applying its laws. *Id.* at 230–31.

Wyoming and Pennsylvania have no conflict. As a result, the Court will apply Pennsylvania law for claims arising out of Mr. Gay's alleged exposure to asbestos in Wyoming.

Virginia and Pennsylvania laws present a true conflict. Under Pennsylvania law, a plaintiff must prove that the plaintiff or decedent was proximately exposed to the defendant-attributable asbestos with sufficient frequency and regularity that such exposure can reasonably be considered a substantial factor in causing the injury. *Eckenrod*, 544 A.2d at 52. Under Virginia law, "[t]he state of Virginia has not adopted the 'frequency, regularity, and proximity' standard that is utilized by many jurisdictions in asbestos cases. Rather, under Virginia law, a plaintiff must prove that a defendant's actions were both the actual and proximate cause of the alleged injuries, under traditional tort liability principles." *Jacobs v. AC&S Inc.*, 2011 U.S. Dist. LEXIS 111808 (E.D. Pa. July 26, 2011).

As both states' laws present a conflict, the Court must analyze the choice of law. The Superior Court of Pennsylvania set forth the choice of law analysis for an asbestos case. In *Normann v. Johns-Manville Corp.*, 593 A.2d 890, 893–95 (Pa. Super. 1991), it wrote, "Pennsylvania courts have abandoned the rule of *lex loci delicti* in favor of a less restrictive approach combining the methodologies of a 'government interest analysis' and the 'significant relationship' approach of the Restatement (Second) of Conflicts § 145 (1971)." (citing *Giovanetti v. Johns-Manville Corp.*, 539 A.2d 871, 872 (Pa. Super. 1988). To determine the greater interest, the Court should not just count contacts but should consider each state's contact qualitatively. *Cipolla v. Shaposka*, 267 A.2d 854 (Pa. 1970).

Plaintiff was allegedly exposed to asbestos from Honeywell products both in Virginia and Wyoming. His alleged exposure in Virginia occurred from 1958 to 1961 and from 1964 to 1967. Plaintiff does not allege that Mr. Gay was exposed to Honeywell products in Pennsylvania. Mr.

9

Gay was not a resident of Pennsylvania during the alleged exposure. Virginia maintains a higher standard for proof of injury in asbestos cases. Pennsylvania's only connection to this case is that Mr. Gay was employed in Pennsylvania following his alleged exposure in Virginia.

As a result, the Court will apply Virginia law in deciding Honeywell's Motion for Summary Judgment for his alleged exposure to Honeywell products at the SM-1 facility in Ft. Belvoir, Virginia. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938); *see also Guar. Trust Co. v. York*, 326 U.S. 99, 108 (1945).

**V.    ANALYSIS**

Honeywell moves for summary judgment because it is not liable for injuries caused by asbestos products for two reasons. First, Plaintiff failed to produce sufficient evidence to satisfy her burden of showing that Mr. Gay was exposed to asbestos fibers of any product manufactured, distributed or supplied by Honeywell. Second, Plaintiff failed to produce sufficient evidence to satisfy her burden of showing that Mr. Gay was exposed to asbestos fibers of any product manufactured, distributed or supplied by Honeywell on a regular, frequent or proximate basis.

"At the heart of an asbestos case is at least product identification—that is, a plaintiff cannot triumph against a manufacturer unless he shows that the victim came across the manufacturer's product and that the product caused his injury." *Mehnert v. Agilent Techs., Inc.*, No. CV 18-893, 2020 WL 1493542 (W.D. Pa. Mar. 27, 2020) (quoting *Walker v. Blackmer Pump Co.*, 367 F. Supp. 3d 360, 372 (E.D. Pa. 2019)). Such an inquiry is "fact-intensive." *Id.*

For Plaintiff to defeat Honeywell's Motion for Summary Judgment, she must show not only that Mr. Gay was exposed to asbestos-containing products with sufficient proximity, regularity and frequency to cause his injuries but also that the asbestos products to which Plaintiff claims exposure were manufactured, distributed or sold by Honeywell. *Eckenrod*, 544 A.2d at 53;

*see also Wilson v. A.P. Green Indus.*, 807 A.2d 922, 924 (Pa. Super. 2002) ("Ideally, a plaintiff or a witness will be able to directly testify that plaintiff breathed in asbestos fibers and that those fivers came from defendant's product."). The Court maintains its "duty to prevent questions from going to the jury which would require it to reach a verdict based on conjecture, surmise, guess or speculation." *Krauss v. Trane*, 104 A.3d 556, 568 (Pa. Super. 2014) (citation omitted).

### A. The Court Grants Honeywell's Motion for Summary Judgment for Mr. Gay's Alleged Exposure in Wyoming.

#### 1. Causation Standard

Before imposing liability on a defendant in a product liability action, Pennsylvania law requires a plaintiff to show not only that the plaintiff was exposed to a defective product manufactured or sold by the defendant but that the plaintiff's exposure was a substantial factor in causing the plaintiff's injury. *Richards v. Raymark Indus. Inc.*, 660 F. Supp. 599 (E.D. Pa. 1987); *Gregg v. V-J Auto Parts Co.*, 943 A.2d 216, 224–26 (Pa. 2007); *accord Robertson v. Allied Signal Inc.*, 914 F.2d 360, 375 (3rd Cir. 1990) (applying Pennsylvania law). The Pennsylvania Supreme Court held in asbestos litigation that "it is appropriate for courts, at the summary judgment stage, to make a reasoned assessment concerning whether, in the light of the evidence concerning frequency, regularity, and proximity of a plaintiff's/decedent's asserted exposure, a jury would be entitled to make the necessary inference of a sufficient causal connection between defendant's product and the asserted injury." *Gregg*, 943 A.2d at 226–27 (adopting the frequency, regularity and proximity standard in asbestos cases). As a result, a plaintiff must prove he was exposed to asbestos from a defendant's product with sufficient frequency, regularity and proximity so that a jury could make the necessary inference of an adequate causal connection between that product and the asserted injury. *Id.* at 227.

As for proximity, a plaintiff cannot merely show that the product was present at the plaintiff's workplace; he must present evidence to establish that the plaintiff inhaled asbestos fibers of the specific product of a manufacturer. *Kardos v. Armstrong Pumps, Inc.*, 222 A.3d 393, 399 (Pa. Super. 2019); *Gutteridge v. A.P. Green Services, Inc.*, 804 A.2d 643, 652 (Pa. Super. 2002), *appeal denied*, 829 A.2d 1158 (2003).

### 2. Analysis

In his affidavit, Mr. Gay discussed Honeywell controls and valves at the PM-1 facility in Sundance, Wyoming. In his deposition, Mr. Gay stated he never worked on the Honeywell controls. He was near others who maintained the controls but did not know if the controls contained asbestos. He did not know the size or the voltage of the instruments. The controls did not undergo routine maintenance. Mr. Gay could not recall seeing Honeywell valves at the PM-1 facility. Mr. Gay was unable to provide detail about the valves, except that they were "flanged." He could not remember specifically if they were flanged, though.

Plaintiff presented evidence that Honeywell sold asbestos products generally. But Plaintiff's evidence does not overcome Honeywell's Motion for Summary Judgment. Plaintiff's evidence lacks any specificity about Mr. Gay's encounters with Honeywell products and whether the Honeywell products contained asbestos. For these reasons, the Court grants Honeywell's Motion for Summary Judgment for Mr. Gay's alleged asbestos exposure in Sundance, Wyoming. (ECF No. 852-2). Plaintiff failed to produce evidence that Mr. Gay worked with or around, was otherwise exposed to or inhaled asbestos fibers released from an asbestos-containing product of Honeywell. Plaintiff cannot establish the requisite element of causation under Pennsylvania law. For these reasons, the Court grants Honeywell's Motion for Summary Judgment.

**B. The Court Grants Honeywell's Motion for Summary Judgment for Mr. Gay's Alleged Exposure in Wyoming.**

    **1. Causation Standard**

The Commonwealth of Virginia is one of the few states that has not adopted the "frequency, regularity, and proximity" standard used by most other jurisdictions in asbestos cases. Under Virginia law, a plaintiff must prove that a defendant's actions were both the actual and proximate cause of the alleged injuries, under traditional tort liability principles. *Jacobs v. AC & S Inc.*, No. MDL 875, 2011 U.S. Dist. LEXIS 111808, at *4 (E.D. Pa. July 25, 2011).

Proximate cause is an "act or omission which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the event, and without which that event would not have occurred." *Sugarland Run Homeowners Assoc. v. Halfmann*, 535 S.E.2d 469, 472 (Va. 2000) (internal citations omitted). Generally, a jury resolves questions of fact, and proximate cause is a question of fact. *Id.* If reasonable minds could not differ, proximate cause becomes an issue of law. *Id.* If two or more potential causes rise to the level of creating a plaintiff's injury, the plaintiff "must fail if it appears from the evidence just as probable damages were caused by one as by the other because the plaintiff must make out his case by a preponderance of the evidence." *McCauley v. Purdue Pharma L.P.*, 331 F. Supp. 2d 449, 462 (W.D. Va. 2004) (quoting *Cape Charles Flying Serv. Inc. v. Nottingham*, 47 S.E.2d 540, 544 (Va. 1948)). The Supreme Court of Virginia has recognized that in cases of asbestos exposure, "[a] plaintiff may prove exposure to a particular manufacturer's product through circumstantial evidence." *Owens-Corning Fiberglas Corp. v. Watson*, 413 S.E.2d 630, 639 (Va. 1992).

    **2. Analysis**

In his affidavit and during his deposition, Mr. Gay discussed Honeywell instruments generally and Honeywell recorders specifically. In his deposition, Mr. Gay testified that at the

SM-1 nuclear power plant in Fort Belvoir, Virginia, a control room operator ensured that all controls were maintained and in working order. Mr. Gay recalled seeing various controls in the control room, but Mr. Gay did not touch the controls. The control room equipment did not undergo routine maintenance.

Mr. Gay never performed any maintenance on any Honeywell instrumentation. On occasion, Mr. Gay was near the "instrument people" when they worked on a Honeywell instrument. The only Honeywell instruments Mr. Gay recalled at SM-1 were Honeywell recorders in the control room. He agreed calibration was a technical task and did not require the manipulation of a Honeywell instrument. It took less than ten to fifteen minutes for the "instrument people" to clean a Honeywell recorder. They blew dust off the Honeywell recorder, but Mr. Gay did not know the composition of that dust. Mr. Gay never worked on a Honeywell recorder. Mr. Gay recalled changing a battery in one of their "readouts," but he did not know for sure if it was a Honeywell instrument. He agreed that the changing of batteries did not require him to work with any asbestos products. The Honeywell recorders recorded temperatures, pressures and rod positions. Mr. Gay also had no personal knowledge that any of the Honeywell recorders contained asbestos. (ECF No. 852-2).

As with his exposure at the PM-1 facility, Plaintiff failed to produce evidence that Mr. Gay worked with or around, was otherwise exposed to or inhaled asbestos fibers released from an asbestos-containing product of Honeywell at the SM-1 facility. Furthermore, Plaintiff failed to show that any Honeywell products were a substantial cause of Mr. Gay's mesothelioma. Plaintiff cannot establish the requisite element of causation under either Virginia or Pennsylvania law. For these reasons, the Court grants Honeywell's Motion for Summary Judgment

## VI. Conclusion

The Court finds that no genuine issue of material fact exists in this case. As a result, Honeywell's Motion for Summary Judgment is granted. Orders of Court will follow.

BY THE COURT:

/s/ William S. Stickman IV
WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

6·17·21
Dated