IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALLISA D. GAY, | |
| *Plaintiff,* | Civil Action No. 2:19-cv-1311 |
| v. | Hon. William S. Stickman IV |
| A.O. SMITH CORPORATION, *et al.,* | |
| *Defendants.* | |

## MEMORANDUM OPINION

WILLIAM S. STICKMAN IV, United States District Judge

Plaintiff Allisa D. Gay ("Plaintiff") sued Defendant SPX Cooling Technologies, Inc., as successor in interest to Marley Cooling Tower, f/k/a Marley Cooling Technologies Inc., f/k/a The Marley Cooling Tower Co., ("Defendant") and various manufacturers and distributors on October 8, 2019 in the Court of Common Pleas of Allegheny County, Pennsylvania and alleged that Decedent Carl E. Gay ("Decedent") developed mesothelioma from exposure to Defendant's asbestos-containing products. On October 11, 2019, Defendant General Electric Co. filed a Notice of Removal to the United States District Court for the Western District of Pennsylvania under 28 U.S.C. § 1446. Before the Court is Defendant's Motion for Summary Judgment. (ECF Nos. 853, 932). The Court must determine whether Plaintiff has properly identified Defendant's products as a cause of Mr. Gay's disease and, ultimately, death. For the following reasons, Defendant's Motion is granted.

## I. Background

This case involves an alleged asbestos-related injury because of Mr. Gay's employment in the United States Navy from 1946 to 1958, the United States Air Force from 1958 to 1967, General Electric Co. from 1967 to 1974, Stone and Webster from 1974 to 1989 and from his automotive work starting in the 1940s. (*See* ECF Nos. 1-1; 1-2). Mr. Gay was diagnosed with mesothelioma in June 2019. (ECF No. 1-15, ¶ 165; ECF No. 675).

Mr. Gay was deposed over nine days—November 5–7, 11–13, 21–22, 25, 2019—and identified various manufacturers, suppliers and users of asbestos products. Mr. Gay died on April 12, 2020. (ECF No. 1-15, ¶ 165; ECF No. 675). His daughter, Allisa D. Gay, was named executor of her father's estate and filed an Amended Complaint on August 13, 2020. (ECF No. 692). Allisa Gay was substituted as Plaintiff. (*Id.*).

## II. Relevant Facts

Plaintiff alleges that Mr. Gay developed mesothelioma from exposure to Defendant's asbestos-containing products while working at the Beaver Valley Power Station in Shippingport, Pennsylvania. Mr. Gay worked at the site from 1974 to 1976. (ECF No. 959-1, ¶ 22). Plaintiff specifically alleges Mr. Gay was exposed to asbestos cement board ("ACB") used in the Marley cooling tower at the Beaver Valley Power Station. Plaintiff claims that Mr. Gay worked with Marley cooling towers or that he worked in an area where other persons worked with the towers and that this use created dust and fibers that he inhaled causing him to contract malignant mesothelioma.

The Marley cooling tower at the Beaver Valley Power Station Unit 1 contained ACB. (ECF No. 965, p. 5). The board was in a ring that surrounded the concrete hyperbolic cooling tower. Mr. Gay testified that his role at the Beaver Valley Power Station was to oversee quality control,

which involved his inspecting the whole plant while it was being constructed. (ECF No. 959-2,

pp. 2, 3, 4–5, 6–7). Mr. Gay testified about his inspection of the Marley cooling tower.

125

| | | |
|---|---|---|
| 24 | | What categories of Marley employees did you work with |

126

| 1 | | and around during your time? |
|---|---|---|
| 2 | A. | At that time, I didn't work around them at |
| 3 | | all. I had inspectors that did, but I did not. |
| 4 | | At a later date, I went in with the |
| 5 | | inspectors and looked at the inside. But I was a |
| 6 | | coward. I wouldn't go up. |
| 7 | Q. | You didn't climb up inside the tower? |
| 8 | A. | No. |
| 9 | Q. | But you had been inside the cooling tower? |
| 10 | A. | Yes. Inside the cooling tower basin, all |
| 11 | | around it, yes. |
| 12 | Q. | And what sorts of things were you inspecting |
| 13 | | when you visited the cooling tower? |
| 14 | A. | See if the equipment was installed, all the |
| 15 | | debris was out. |
| 16 | MR. WIMER: | Could you say that again? I |
| 17 | | can't hear you. |
| 18 | THE WITNESS: | You made sure that all the |
| 19 | | debris was out of the catch basin. |
| 20 | BY MR. McLEIGH: | |
| 21 | Q. | When you say debris, what—what sorts of |
| 22 | | debris are you talking about? |
| 23 | A. | Pieces of concrete that has fell off. You |
| 24 | | know, when you're building something like that, you |

127

| 1 | | always have pieces here and there. |
|---|---|---|
| 2 | Q. | So this is construction debris, right? |
| 3 | A. | Right. |
| 4 | Q. | Was that—and I think you just said it. |
| 5 | | Was that a common thing to observe at Beaver Valley, |
| 6 | | that presence of construction debris that was left over |
| 7 | | from some of the work that was done. |
| 8. | A. | Yes. |

(ECF No. 952-2, pp. 8–9). Mr. Gay also testified about the interior of the Marley cooling tower.

110

| 3 | | And as I understand it, you went into the |
|---|---|---|
| 4 | | tower to look at equipment? You mentioned motors? |
| 5 | A. | We went in to—yes, to look at equipment, |

3

| | |
|---|---|
| 6 | but my interest there was mainly for the cleanliness in |
| 7 | the basement. |
| 8 | Q. Now, this was a natural-draft cooling tower |
| 9 | that didn't have motors or fans? |
| 10 | A. It had motors to pump the water, but they |
| 11 | were not inside. |
| 12 | Q. So there were motors in the system, the |
| 13 | plant system, that pumped water to the cooling tower? |
| 14 | A. Pumped water through the cooling tower. It |
| 15 | went up, cascaded down over the baffles, natural-draft |
| 16 | cooling. |
| 17 | Q. So those pumps were not on the cooling tower |
| 18 | or part of the cooling tower; they were part of the |
| 19 | plant system getting water to the tower? |
| 20 | A. I gue-—yes. I would say that's correct. |
| 21 | Q. Okay. All right. And so your interest was |
| 22 | in cleanliness, and as I understand it, you saw some |
| 23 | concrete debris inside the cooling tower? |
| 24 | A. Different kinds of debris. |

111

| | |
|---|---|
| 1 | Q. Well, you mentioned concrete and nothing |
| 2 | else. |
| 3 | A. Well— |
| 4 | Q. So was there other debris in the cooling |
| 5 | tower? |
| 6 | A. Dirt. |
| 7 | Q. All right. |
| 8 | A. Normal construction. |
| 9 | Q. Do you have any evidence that you can give |
| 10 | that you were exposed to asbestos from this limited |
| 11 | exposure to the cooling tower? |
| 12 | A. No. |
| 13 | Q. Okay. |

(ECF No. 959-3, p. 3).

Plaintiff also presented evidence from James Daugherty who was deposed in a separate

litigation who worked at the Beaver Valley Power Station after Mr. Gay left. Mr. Daugherty

testified that he handled material from inside the cooling tower in the 1980s and that the baffles

from the tower were a crumbly sheeting material. (ECF No. 959-5). Documents from separate

litigation also showed that Marley used asbestos in the Marley cooling tower and referred to the

material as "ACB fill material." Records specified that construction on the tower was completed

in 1974. The records showed that an Aurora pump and Mueller butterfly valves were part of the installation of the tower.

Plaintiff cites several events that occurred after Mr. Gay left the facility including the testimony of Mr. Daugherty, the replacement of ACB louvers in 1976 and again in 1984. (ECF No. 959, p. 10).

Defendant does not deny that it had control of the tower. Defendant also does not deny that asbestos was used in the construction of the tower. (ECF No. 932-1, p. 5).

Defendant deposed Plaintiff's hygiene expert, Frank M. Parker III. (ECF No. 1054). In his deposition, Mr. Parker could not testify that Mr. Gay knew he was exposed to asbestos from the Marley cooling tower. Accordingly, Mr. Parker did not have specific knowledge that Mr. Gay was exposed to asbestos from a product of Defendant. (*Id.* at 2).

### III.    Standard of Review

Summary judgment is warranted if the Court is satisfied that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 322 (1986). A fact is material if it must be decided to resolve the substantive claim or defense to which the motion is directed. In other words, there is a genuine dispute of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must view the evidence presented in the light most favorable to the nonmoving party. *Id.* at 255. It refrains from making credibility determinations or weighing evidence. *Id.* "Real questions about

credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof" will defeat a motion for summary judgment. *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007).

## IV.    Applicable Law

### A. Pennsylvania Law Applies

The parties agree that Pennsylvania substantive law applies. For that reason, the Court will apply Pennsylvania law. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938); *see also Guar. Trust Co. v. York*, 326 U.S. 99, 108 (1945).

### B. Causation Standard

Before imposing liability on a defendant in a product liability action, Pennsylvania law requires a plaintiff to show not only that the plaintiff was exposed to a defective product manufactured or sold by the defendant but that the plaintiff's exposure was a substantial factor in causing the plaintiff's injury. *Richards v. Raymark Indus. Inc.*, 660 F. Supp. 599 (E.D. Pa. 1987); *Gregg v. V-J Auto Parts Co.*, 943 A.2d 216, 224–26 (Pa. 2007); *accord Robertson v. Allied Signal Inc.*, 914 F.2d 360, 375 (3rd Cir. 1990) (applying Pennsylvania law). The Pennsylvania Supreme Court held in asbestos litigation that "it is appropriate for courts, at the summary judgment stage, to make a reasoned assessment concerning whether, in the light of the evidence concerning frequency, regularity, and proximity of a plaintiff's/decedent's asserted exposure, a jury would be entitled to make the necessary inference of a sufficient causal connection between defendant's product and the asserted injury." *Gregg*, 943 A.2d at 226–27 (adopting the frequency, regularity and proximity standard in asbestos cases). As a result, a plaintiff must prove he was exposed to asbestos from a defendant's product with sufficient frequency, regularity and proximity so that a jury could make the necessary inference of an adequate causal connection between that product and the asserted injury. *Id.* at 227.

As for proximity, a plaintiff cannot merely show that the product was present at the plaintiff's workplace; he must present evidence to establish that the plaintiff inhaled asbestos fibers of the specific product of a manufacturer. *Kardos v. Armstrong Pumps, Inc.*, 222 A.3d 393, 399 (Pa. Super. 2019); *Gutteridge v. A.P. Green Services, Inc.*, 804 A.2d 643, 652 (Pa. Super. 2002), *appeal denied*, 829 A.2d 1158 (2003).

## V.  ANALYSIS

Defendant moves for summary judgment because it is not liable for injuries caused by asbestos products for two reasons. First, Plaintiff failed to produce sufficient evidence to satisfy her burden of showing that Mr. Gay was exposed to asbestos fibers of any product manufactured, distributed or supplied by Marely Cooling. Second, Plaintiff failed to produce sufficient evidence to satisfy her burden of showing that Mr. Gay was exposed to asbestos fibers of any product manufactured, distributed or supplied by Marley Cooling on a regular, frequent or proximate basis.

"At the heart of an asbestos case is at least product identification—that is, a plaintiff cannot triumph against a manufacturer unless he shows that the victim came across the manufacturer's product and that the product caused his injury." *Mehnert v. Agilent Techs., Inc.*, No. CV 18-893, 2020 WL 1493542 (W.D. Pa. Mar. 27, 2020) (quoting *Walker v. Blackmer Pump Co.*, 367 F. Supp. 3d 360, 372 (E.D. Pa. 2019)). Such an inquiry is "fact-intensive." *Id.*

For Plaintiff to defeat Defendant's Motion for Summary Judgment, Plaintiff must show not only that Mr. Gay was exposed to asbestos-containing products with sufficient proximity, regularity and frequency to cause his injuries but also that the asbestos products to which Plaintiff claims exposure were manufactured, distributed or sold by Defendant. *Eckenrod*, 544 A.2d at 53; *see also Wilson v. A.P. Green Indus.*, 807 A.2d 922, 924 (Pa. Super. 2002) ("Ideally, a plaintiff or a witness will be able to directly testify that plaintiff breathed in asbestos fibers and that those

7

fivers came from defendant's product."). The Court has a "duty to prevent questions from going to the jury which would require it to reach a verdict based on conjecture, surmise, guess or speculation." *Krauss v. Trane*, 104 A.3d 556, 568 (Pa. Super. 2014) (citation omitted).

Defendant highlights that Plaintiff has not shown that the dust Mr. Gay testified seeing was asbestos dust. Although the cooling tower contained ACB, Mr. Gay did not testify that he was exposed to that material. He entered the tower to look for construction debris. He did not testify how long he spent in the tower.

Plaintiff claims Mr. Gay was exposed to valves and pumps that contained asbestos and related to the cooling tower. Yet, Mr. Gay never testified that he was near pumps or valves in the cooling tower. While the evidence suggests those pumps and valves contained asbestos, Plaintiff cites no evidence that places the pumps or valves in the tower. The evidence merely suggests that the pumps and valves were somehow related to the construction of the tower. Moreover, Mr. Gay never testified to being near pumps or valves in the cooling tower.

Plaintiff cannot establish that Mr. Gay was exposed to the alleged asbestos with regularity, frequency or proximity. Mr. Gay testified that he entered the tower after its completion and saw dust on the ground. It was then the job of the contractors to clean up the dust. (ECF No. 959-2, p. 9). Mr. Gay never worked directly with any Marley contractors. (*Id.* at 8–9). Ultimately, Defendant argues, Plaintiff failed to proffer enough evidence to show that Mr. Gay was exposed to any asbestos in the cooling tower, whether it involved asbestos from the cement board or a Mueller mud valve or an Aurora pump. (ECF No. 965, p. 5).

The Court agrees that a factfinder could not find for Plaintiff without making several inferential leaps. *See Liberty Lobby*, 477 U.S. at 248. Plaintiff does not provide facts to establish that the dust Mr. Gay testified to seeing was asbestos dust. For these reasons, the Court finds

Plaintiff failed to proffer enough evidence to show SPX's cooling tower was a factor in Mr. Gay's mesothelioma.

**VI.     Conclusion**

The Court finds that a genuine issue of material fact does not exist in this case. As a result, Defendant's Motion for Summary Judgment is granted. Orders of Court will follow.

BY THE COURT:

_____
WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

6.17.21
Dated

9