IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALLISA D. GAY,<br><br>        *Plaintiff,*<br><br>v.<br><br>A.O. SMITH CORPORATION, *et al.*,<br><br>        *Defendants.* | Civil Action No. 2:19-cv-1311<br><br>Hon. William S. Stickman IV |

**MEMORANDUM OPINION**

WILLIAM S. STICKMAN IV, United States District Judge

    Plaintiff Allisa D. Gay ("Plaintiff") sued Defendant Power Piping Co. ("Defendant") and various manufacturers and distributors on October 8, 2019 in the Court of Common Pleas of Allegheny County, Pennsylvania and alleged that Decedent Carl E. Gay ("Decedent") developed mesothelioma from exposure to Defendant's asbestos-containing products. On October 11, 2019, Defendant General Electric Co. filed a Notice of Removal to the United States District Court for the Western District of Pennsylvania under 28 U.S.C. § 1446. Before the Court is Power Piping's Motion for Summary Judgment. (ECF No. 878). The Court must determine whether Plaintiff has properly identified Power Piping as having placed asbestos-containing products in Mr. Gay's workplace as a cause of Mr. Gay's disease and, ultimately, death. For the following reasons, Power Piping's Motion is denied.

    **I.**    **Background**

    This case involves an alleged asbestos-related injury because of Mr. Gay's employment in the United States Navy from 1946 to 1958, the United States Air Force from 1958 to 1967, General

1

Electric Co. from 1967 to 1974, Stone and Webster from 1974 to 1989 and from his automotive work starting in the 1940s. (*See* ECF Nos. 1-1; 1-2). Mr. Gay was diagnosed with mesothelioma in June 2019. (ECF No. 1-15, ¶ 165; ECF No. 675).

Mr. Gay was deposed over nine days—November 5–7, 11–13, 21–22, 25, 2019—and identified various manufacturers, suppliers and users of asbestos products. Mr. Gay died on April 12, 2020. (ECF No. 1-15, ¶ 165; ECF No. 675). His daughter, Allisa D. Gay, was named executor of her father's estate and filed an Amended Complaint on August 13, 2020. (ECF No. 692). Allisa Gay was substituted as Plaintiff. (*Id.*).

## II.  Relevant Facts

Plaintiff alleges that Mr. Gay developed mesothelioma from exposure to Defendant's asbestos-containing products while working at the Beaver Valley Power Station from 1974 to 1976. (ECF No. 942-1, ¶ 22). Plaintiff argues Mr. Gay was exposed to asbestos products used by Power Piping's contract workers. (*Id.*).

Mr. Gay was an employee of Stone & Webster and worked as a quality control supervisor at the Beaver Valley Power Station. Mr. Gay testified that he worked with Power Piping employees for two years, and those employees used asbestos-containing products. (*Id.*). Mr. Gay recalled Power Piping fabricated the piping for the facility and that various tradespersons handled welding blankets, thermal insulation, gaskets and packing near him. (ECF No. 942-2, pp. 2–3).

```
                                  120
 5     Q. Did Power Piping have welders at Beaver
 6        Valley?
 7     A. Yes.
 8     Q. Is that some of the work that the
 9        pipefitters would do, weld the pipes?
10     A. Well, the welders welded the pipe.
11     Q. Did they use welding blankets?
12     A. They did from time to time, yes.
13     Q. How close would you work to—or have
```

2

| | |
|---|---|
| 14 | worked to employees of Power Piping when you were at |
| 15 | Beaver Valley? |
| 16 | A. Occasionally close. But, once again, not on |
| 17 | a daily basis. I wouldn't say even on a weekly basis. |
| 18 | But certainly a few times a month you were—you had to |
| 19 | be around them. |
| 20 | Q. Okay. Do you believe you were exposed to |
| 21 | asbestos— |
| 22 | MS. SOSSO: Objection. |
| 23 | BY MR. McLEIGH: |
| 24 | Q. —from the work of Power Piping employees? |

121

| | |
|---|---|
| 1 | A. Yes, from the blankets. Have to understand, |
| 2 | they used blankets to protect not the welder but the |
| 3 | equipment that's around. Because the welding blankets, |
| 4 | they don't burn. They don't catch on fire. And you can |
| 5 | hang them up, lay them over equipment and you're not |
| 6 | worried about the hot slag from the—the weld hopping |
| 7 | over and getting on an electrical line or anything that |
| 8 | will harm—it will harm. |
| 9 | Q. So what did that mean to you in terms of |
| 10 | being a Stone & Webster employee? What—how would you |
| 11 | encounter the welding blankets? |
| 12 | A. Just passing by. And as I said, you worked |
| 13 | around them sometimes, but, again, not on a daily basis. |
| 14 | Q. Were the welding blankets similar to what |
| 15 | you described for us earlier when you were talking about |
| 16 | your welding career— |
| 17 | A. Yeah. They're all the same. |
| 18 | MS. GORDON: Object to form. |
| 19 | BY MR. McLEIGH: |
| 20 | Q. Do you recall approximately how long Power |
| 21 | Piping was on the job? |
| 22 | A. They—I think they were—some of them |
| 23 | were still there, seemed like, when I left. |
| 24 | Q. So for—for two years? |

122

| | |
|---|---|
| 1 | A. Yes, at least. |
| 2 | Q. Did any of the work of Power Piping involve |
| 3 | work on flanged connections? |
| 4 | A. Sure. If you're installing systems, you've |
| 5 | got to have flanges somewhere along the line. |
| 6 | Q. Did that flange work require them to use |
| 7 | gaskets? |
| 8 | A. Yes. |
| 9 | Q. Would those gaskets be applied in the same |

3

| | |
|---|---|
| 10 | manner that you described for us during your deposition? |
| 11 | A. Yes. |
| 12 | MS. GORDON: Object to the form. |
| 13 | BY MR. McLEIGH: |
| 14 | Q. Would Power Piping employees have installed |
| 15 | gaskets to pipe systems when you were in the area? |
| 16 | A. At times, yes. |

(*Id.*). Later in his deposition, Mr. Gay recalled the types of materials the contract workers.

86

| | |
|---|---|
| 2 | Q. Can you estimate for me at all how many of |
| 3 | the Power Piping workers were there when you started? |
| 4 | A. No. |
| 5 | Q. And how about when you left? |
| 6 | A. No. |
| 7 | Q. How do you associate or how do you recall |
| 8 | the Power Piping workers? Why is it that you can recall |
| 9 | Power Piping with certain workers there? |
| 10 | A. It seemed like in our inspection group, |
| 11 | somewhere we would run across, who was the contractor? |
| 12 | It was Power Piping. I'm not sure how to answer that |
| 13 | question. |
| 14 | Q. Well, I guess I wanted to know was there |
| 15 | something they were wearing that— |
| 16 | A. No. |
| 17 | Q. —designated them as Power Piping? Whether |
| 18 | they had a uniform on or a hard hat on. |
| 19 | A. They had hard hats. And I don't remember |
| 20 | whether they had color-designated hard hats there or |
| 21 | not. |
| 22 | Q. Okay. And on the hard hat, did you remember |
| 23 | seeing "Power Piping" or— |
| 24 | A. No, I do not. |

87

| | |
|---|---|
| 1 | Q. Okay. And do you recall what exactly they |
| 2 | were doing at the facility, the Power Piping workers? |
| 3 | A. I believe that they had the entire piping |
| 4 | contract. But you understand, that was—when I got |
| 5 | there, I think I said before, it was 75 to 80 percent |
| 6 | complete, or something in that order, so . . . |
| 7 | Q. Okay. So they—they were installing the |
| 8 | metal—the actual piping, the metal piping? |
| 9 | A. Yes. |
| 10 | Q. And you had—I believe you had mentioned |
| 11 | that a few times a month they would be—when they were |
| 12 | installing that, there were gaskets that they used on |

| | | |
|---|---|---|
| 13 | | flanges? |
| 14 | A. | Yes. |
| 15 | Q. | That that was an occasional thing, two to |
| 16 | | three times per month? |
| 17 | A. | Well— |
| 18 | Q. | That you were around it. |
| 19 | A. | Occasionally. I'm—I'm not sure it was |
| 20 | | two or three times a month or what, but it was— |
| 21 | Q. | Could it have been less? |
| 22 | A. | It could have been less, but it could have |
| 23 | | been more too. |
| 24 | Q. | And when they were doing that installation |

88

| | | |
|---|---|---|
| 1 | | of the gasket material, was it Stone & Webster that |
| 2 | | supplied the gasket material for them? |
| 3 | A. | I assume that it was. |
| 4 | Q. | Do you recall a brand name, manufacturer or |
| 5 | | supplier of that gasket material? |
| 6 | A. | No. |
| 7 | Q. | And do you believe that that—that gasket |
| 8 | | material contained asbestos? |
| 9 | A. | At that time, yes. |
| 10 | Q. | And why is that? |
| 11 | A. | Because of the color, the time frame. I |
| 12 | | realize that there is a lot of memos around that talks |
| 13 | | about changing asbestos here and there, but I don't |
| 14 | | remember those memos saying anything about the gaskets, |
| 15 | | and I do not remember them ever saying anything about |
| 16 | | replacing material that had already been installed. So |
| 17 | | it would be my belief that anything up until that time |
| 18 | | was probably asbestos. |
| 19 | Q. | Okay. And with this being a new |
| 20 | | construction, would they—it would be all new |
| 21 | | materials that they were putting in? |
| 22 | A. | Yes. That's my belief, yes. |
| 23 | Q. | And how far would you be from the Power |
| 24 | | Piping workers when they were doing any of this |

89

| | | |
|---|---|---|
| 1 | | installation? |
| 2 | A. | I could be close by, or I could just be |
| 3 | | walking by. |
| 4 | Q. | And when— |
| 5 | A. | If they were— |
| 6 | Q. | —you say—go ahead. |
| 7 | A. | If they were installing the gaskets or |
| 8 | | removing them after and a hydrostatic test for us, then |

5

| | | |
|---|---|---|
| 9 | | we would be there with them because we had to make sure |
| 10 | | that the cleanliness was carried out. |
| 11 | Q. | So you could be as close as how many feet to |
| 12 | | them? |
| 13 | A. | As close as a couple of feet or— |
| 14 | Q. | Or as far— |
| 15 | A. | —or as far away as 6 or 8 feet. |
| 16 | Q. | Now, you also had mentioned some welding |
| 17 | | blankets. Do you recall if the Power Piping workers |
| 18 | | were using these welding blankets? |
| 19 | A. | I believe that I saw Power Piping use some |
| 20 | | welding blankets, yes. |
| 21 | Q. | And, again, these welding blankets would |
| 22 | | have been supplied to them by Stone & Webster? |
| 23 | A. | I would assume so, but I wouldn't say that |
| 24 | | that was a fact. |

90

| | | |
|---|---|---|
| 1 | Q. | Do you recall any brand name, manufacturer, |
| 2 | | or supplier of the welding blankets? |
| 3 | A. | No. |
| 4 | Q. | And, again, how far would you be from the |
| 5 | | Power Piping workers if they were using these welding |
| 6 | | blankets? |
| 7 | A. | Normally you would not be very close because |
| 8 | | they would be welding. And, again, for safety and your |
| 9 | | eyes, you wouldn't be up close to them. |
| 10 | Q. | Do you recall the names of any of the Power |
| 11 | | Piping workers? |
| 12 | A. | No, I do not. |
| 13 | Q. | And do you believe those welding blankets |
| 14 | | contained asbestos? |
| 15 | A. | I believe that they did, but I don't |
| 16 | | remember seeing anything on them that says "this is made |
| 17 | | out of asbestos." |
| 18 | Q. | Okay. And why do you believe they contained |
| 19 | | asbestos? |
| 20 | A. | Because that was the normal thing that had |
| 21 | | been in use for years. It was a good material. It |
| 22 | | didn't burn through. |
| 23 | | And when they used these blankets, sometimes |
| 24 | | it was—most of it was to protect the equipment or |

91

| | | |
|---|---|---|
| 1 | | piping adjacent to it because you don't want arc tracks, |
| 2 | | what have you, on the—the piping that's next to it. |

(ECF No. 942-3, pp. 2–3).

Through an affidavit from a corporate representative of Power Piping, Plaintiff presented information that Power Piping did not stop specifying the use of asbestos-containing gaskets for piping systems. (ECF No. 943-4, p. 6). Plaintiff also presented the affidavit of Reis Ahearn who worked at the Beaver Valley Power Station from 1970 until 1981. (ECF No. 942-5, p. 1). He stated that Power Piping supplied pipe and asbestos-containing gaskets to the job site. (*Id.*). Those gaskets were marked "asbestos." (*Id.*). Plaintiff also presented various affidavits of companies that produced asbestos-containing materials during Mr. Gay's tenure at the Beaver Valley Power Station. (*See* ECF Nos. 942-4, 942-5, 942-6, 942-7, 942-8, 942-9, 942-10). Plaintiff proffered each affidavit to show what was typical of welding blankets and gaskets of the time. (ECF No. 942, p. 7).

Arnold Moore, P.E., in his expert report for naval submarines, explained that asbestos-free gaskets were not commercially viable until the 1970s and 1980s and that the U.S. Navy did not attempt to substitute such gaskets. (ECF No. 942-11, p. 3).

### III. Standard of Review

Summary judgment is warranted if the Court is satisfied that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 322 (1986). A fact is material if it must be decided to resolve the substantive claim or defense to which the motion is directed. In other words, there is a genuine dispute of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must view the evidence presented in the light most favorable to the nonmoving party. *Id.* at 255. It refrains from making credibility determinations or weighing evidence. *Id.* "Real questions about

7

credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof" will defeat a motion for summary judgment. *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007).

IV. **Applicable Law**

A. **Pennsylvania Law Applies**

The parties agree that Pennsylvania substantive law applies. For that reason, the Court will apply Pennsylvania law. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938); *see also Guar. Trust Co. v. York*, 326 U.S. 99, 108 (1945).

B. **Causation Standard**

Before imposing liability on a defendant in a product liability action, Pennsylvania law requires a plaintiff to show not only that the plaintiff was exposed to a defective product manufactured or sold by the defendant but that the plaintiff's exposure was a substantial factor in causing the plaintiff's injury. *Richards v. Raymark Indus. Inc.*, 660 F. Supp. 599 (E.D. Pa. 1987); *Gregg v. V-J Auto Parts Co.*, 943 A.2d 216, 224–26 (Pa. 2007); *accord Robertson v. Allied Signal Inc.*, 914 F.2d 360, 375 (3rd Cir. 1990) (applying Pennsylvania law). The Pennsylvania Supreme Court held in asbestos litigation that "it is appropriate for courts, at the summary judgment stage, to make a reasoned assessment concerning whether, in the light of the evidence concerning frequency, regularity, and proximity of a plaintiff's/decedent's asserted exposure, a jury would be entitled to make the necessary inference of a sufficient causal connection between defendant's product and the asserted injury." *Gregg*, 943 A.2d at 226–27 (adopting the frequency, regularity and proximity standard in asbestos cases). As a result, a plaintiff must prove he was exposed to asbestos from a defendant's product with sufficient frequency, regularity and proximity so that a jury could make the necessary inference of an adequate causal connection between that product and the asserted injury. *Id.* at 227.

8

As for proximity, a plaintiff cannot merely show that the product was present at the plaintiff's workplace; he must present evidence to establish that the plaintiff inhaled asbestos fibers of the specific product of a manufacturer. *Kardos v. Armstrong Pumps, Inc.*, 222 A.3d 393, 399 (Pa. Super. 2019); *Gutteridge v. A.P. Green Services, Inc.*, 804 A.2d 643, 652 (Pa. Super. 2002), *appeal denied*, 829 A.2d 1158 (2003).

V.    **ANALYSIS**

Defendant moves for summary judgment because it alleges Plaintiff failed to establish that Mr. Gay was exposed to any asbestos-containing products installed by Power Piping Company.

"At the heart of an asbestos case is at least product identification—that is, a plaintiff cannot triumph against a manufacturer unless he shows that the victim came across the manufacturer's product and that the product caused his injury." *Mehnert v. Agilent Techs., Inc.*, No. CV 18-893, 2020 WL 1493542 (W.D. Pa. Mar. 27, 2020) (quoting *Walker v. Blackmer Pump Co.*, 367 F. Supp. 3d 360, 372 (E.D. Pa. 2019)). Such an inquiry is "fact-intensive." *Id.*

For Plaintiff to defeat Defendant's Motion for Summary Judgment, Plaintiff must show not only that Mr. Gay was exposed to asbestos-containing products with sufficient proximity, regularity and frequency to cause his injuries but also that the asbestos products to which Plaintiff claims exposure were manufactured, distributed or sold by Defendant. *Eckenrod*, 544 A.2d at 53; *see also Wilson v. A.P. Green Indus.*, 807 A.2d 922, 924 (Pa. Super. 2002) ("Ideally, a plaintiff or a witness will be able to directly testify that plaintiff breathed in asbestos fibers and that those fivers came from defendant's product."). The Court has a "duty to prevent questions from going to the jury which would require it to reach a verdict based on conjecture, surmise, guess or speculation." *Krauss v. Trane*, 104 A.3d 556, 568 (Pa. Super. 2014) (citation omitted).

9

Plaintiff, through her affidavits and depositions, presented sufficient evidence to show that Mr. Gay was exposed to asbestos fibers with the requisite frequency, regularity proximity. Mr. Gay worked within six feet of Power Piping contract workers. (ECF No. 942-3, p. 2). He was near those workers at least a few times per month over two years. (ECF No. 942-2, pp. 2–3). Those workers installed gaskets and used welding blankets. (*Id.* at 2). The issue that remains is whether those materials contained asbestos. Accordingly, summary judgment is inappropriate at this juncture.

**VI. Conclusion**

The Court finds that a genuine issue of material fact exists, which precludes summary judgment. As a result, Defendant's Motion for Summary Judgment is denied. An Order of Court will follow.

BY THE COURT:

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

6-17-21
Dated