IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALLISA D. GAY,<br><br>    *Plaintiff*,<br><br>v.<br><br>A.O. SMITH CORPORATION, *et al.*,<br><br>    *Defendants*. | Civil Action No. 2:19-cv-1311<br><br>Hon. William S. Stickman IV |

## **MEMORANDUM OPINION**

Plaintiff Allisa D. Gay ("Plaintiff") sued Defendants Exelon Corp., Exelon Generation Co. and Exelon Nuclear Partners, LLC ("Defendants") and various manufacturers and distributors on October 8, 2019 in the Court of Common Pleas of Allegheny County, Pennsylvania and alleged that Decedent Carl E. Gay ("Decedent") developed mesothelioma from exposure to Defendants' asbestos-containing products. On October 11, 2019, Defendant General Electric Co. filed a Notice of Removal to the United States District Court for the Western District of Pennsylvania under 28 U.S.C. § 1446. Before the Court is Defendants' Motion for Summary Judgment. (ECF No. 907). The Court must determine whether Plaintiff properly identified Defendants as a cause of Mr. Gay's disease and, ultimately, death. For the following reasons, Defendants' Motion is granted in part and denied in part.

**I.    Background**

This case involves an alleged asbestos-related injury because of Mr. Gay's employment in the United States Navy from 1946 to 1958, the United States Air Force from 1958 to 1967, General Electric Co. from 1967 to 1974, Stone and Webster from 1974 to 1989 and from his automotive

1

work starting in the 1940s. (*See* ECF Nos. 1-1; 1-2). Mr. Gay was diagnosed with mesothelioma in June 2019. (ECF No. 1-15, ¶ 165; ECF No. 675).

Mr. Gay was deposed over nine days—November 5–7, 11–13, 21–22, 25, 2019—and identified various manufacturers, suppliers and users of asbestos products. Mr. Gay died on April 12, 2020. (ECF No. 1-15, ¶ 165; ECF No. 675). His daughter, Allisa D. Gay, was named executor of her father's estate and filed an Amended Complaint on August 13, 2020. (ECF No. 692). Allisa Gay was substituted as Plaintiff. (*Id.*).

## II. Relevant Facts

Plaintiff alleges that Mr. Gay developed mesothelioma from exposure to asbestos fibers from two power stations owned by Defendants: Nine Mile Point Power Station and Limerick Power Plant. Mr. Gay began working for Stone & Webster in 1974 and remained with the company until 1989. (ECF No. 908-1, p. 3). While under the employment of Stone & Webster, Mr. Gay worked at both power stations. (*Id.* at 5, 7–8). He worked as a Field Quality Control Supervisor overseeing structural and electrical inspections. (*Id.* at 8–11). In January 1979, he was promoted to Superintendent of Quality Control and oversaw the Quality Control group. (*Id.* at 11). In his role, Mr. Gay recorded the work in progress and recommended inspectors for nondestructive testing, which included x-rays, ultrasonic, dye tests and magnetic inspections. (*Id.* at 12–14). Mr. Gay rarely accompanied the inspectors but at times entered the field to observe the inspections. (*Id.* at 13). Mr. Gay saw subcontractors install pipe covers at the Nine Mile Plant Unit 2. (*Id.* at 15). Mr. Gay, although he did not recall a specific instance, believed he was exposed to asbestos-containing products that were being used and installed at these facilities. (*Id.* at 18–20).

Mr. Gay worked at the Nine Mile Power Plant from 1977 to 1981. During that time, workers installed piping, and Mr. Gay testified he was often near the millwrights who installed that equipment. (ECF No. 946-2, p. 4). He worked closely with contractors who handled and installed Flexitallic gaskets on the piping system. (*Id.* at 6).

```
                              42
11   Q. Okay. You talked about the insulation and
12      the electrical workers, and you—you were telling us
13      about the various categories of trades that were there,
14      and you said that there were millwrights there.
15   A. Yes.
16   Q. What kind of work did the millwrights do?
17   A. They install pumps, that type equipment.
18   Q. Did you have occasion to work around them?
19   A. Yes.
20   Q. What sorts of duties brought you in
21      proximity to the millwrights?
22   A. Well, you were in close proximity—well,
23      especially when you were doing inspection. I think—I
24      explained before. When you were taking alignments of
                              43
1       the shafts on the pumps, they would have to disconnect
2       them, so they would be there doing their work while we
3       were doing ours—or doing their work so we could do
4       ours.
5    Q. Was that something that happened frequently
6       at the Nine Mile facility?
7    A. Yes.
```

(ECF No. 946-2, p. 4). Later, he provided testimony about the workers' use of Flexitallic gaskets.

```
                              44
                              ***
6    Q. Okay. Earlier in your deposition, you've
7       talked about gaskets and packing. Were you exposed to
8       those products at Nine Mile?
9    MR. HUETTER: Objection.
10   MR. BRYSON: Objection.
11   MR. BRUNI: Object to form.
12   MS. COX: Objection.
13   MS. BERTIN: Objection. Foundation.
14   THE WITNESS: Frequently. I mean—I mean
15      not frequently. Most of the equipment is new. It
```

| | |
|---|---|
| 16 | doesn't need packing, what have you. So the only thing |
| 17 | that you would be around from time to time is when |
| 18 | the—they were installing gaskets. |
| 19 | MR. McLEIGH: Okay. |
| 20 | THE WITNESS: I repeat before, I think, |
| 21 | during the piping installation, we have to flush the |
| 22 | piping, have to do hydrostatic tests on it. So they |
| 23 | install a section of piping and flush it. |
| 24 | Then it's okay for them to install another |

45

| | |
|---|---|
| 1 | part. And from time to time, those two sections would |
| 2 | be joined by a flange. And we would be there when they |
| 3 | were joining that up to make sure that cleanliness was |
| 4 | carried out. |
| 5 | BY MR. McLEIGH: |
| 6 | Q. Okay. Were there gaskets associated, |
| 7 | typically, with those kinds of flanges? |
| 8 | A. Yes. |
| 9 | Q. What kinds of gaskets? |
| 10 | A. Flexitallics. Sometimes on a smaller |
| 11 | system, you would have just regular flat, sheet-type |
| 12 | gaskets. |
| 13 | Q. Did you observe workers removing old |
| 14 | Flexitallic gaskets and replacing them with new |
| 15 | Flexitallic gaskets when you were doing your |
| 16 | observations of the hydrostatic testing? |
| 17 | MR. BRUNI: Object to form. |
| 18 | MS. BERTIN: Object to form. |
| 19 | THE WITNESS: No. |
| 20 | BY MR. McLEIGH: |
| 21 | Q. Okay. How is it that you know that those— |
| 22 | those flanges required Flexitallic gaskets? |
| 23 | A. How do I know? |
| 24 | Q. Uh-huh. |

46

| | |
|---|---|
| 1 | A. Because the spec tells you that. |
| 2 | Q. Okay. Did you actually see them in place in |
| 3 | the field? |
| 4 | A. Yes. |
| 5 | Q. Whenever—you were telling us about how |
| 6 | they'd have to separate the sections and then join them |
| 7 | back together as part of that hydrostatic testing. |
| 8 | A. Yes. |
| 9 | Q. How close would you be when they were doing |
| 10 | that work? |
| 11 | A. You'd be right there. |

```
12   Q. Right next to them?
13   A. Yes.
```

(*Id.* at 4–5).

Mr. Gay testified about his work generally, which included being around welders using welding blankets. He testified that he believed the welding blankets contained asbestos. He did not know who manufactured the blankets. (ECF No. 946-3, p. 2).

Mr. Gay provided testimony about his time at the Limerick Power Station.

```
                            55
12   Q. Do you believe you were exposed to asbestos
13      at the Limerick plant?
14   MR. HUETTER: Objection.
15   MS. BERTIN: Object to form. Lack of
16      foundation.
17   THE WITNESS: Probably, because the job that
18      I had—each one of us was assigned a—a certain
19      section of the plant or components to look at. And one
20      of mine was the heating, ventilation, air-conditioning,
21      and to assist the piping people in their inspection.
22      And you had to crawl everywhere. You had to
23      look at everything on that equipment to make sure that
24      it had been installed according to specs. And it was a
                            56
1       dirty, dusty job that you didn't really want.
```

Plaintiff provided the interrogatory answers of Flexitallic. Flexitallic gaskets contained asbestos from 1912 to 1992. The material was a mixture of 90% asbestos and 10% other ingredients. (ECF No. 946-4).

Exelon Generation Co. argues that neither Exelon Corp. nor Exelon Nuclear Partners currently or ever operated, owned or controlled the Limerick Power Station or the Nine Mile Power Plant. (ECF No. 946-10, pp. 1–2).

Plaintiff's hygiene expert offered that mesothelioma can occur in cases with low asbestos exposure and that Mr. Gay's potential exposure at either plant would put him at risk for developing the disease. (ECF No. 946-11).

**III.     Standard of Review**

Summary judgment is warranted if the Court is satisfied that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 322 (1986). A fact is material if it must be decided to resolve the substantive claim or defense to which the motion is directed. In other words, there is a genuine dispute of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must view the evidence presented in the light most favorable to the nonmoving party. *Id.* at 255. It refrains from making credibility determinations or weighing evidence. *Id.* "Real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof" will defeat a motion for summary judgment. *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007).

**IV.     Applicable Law**

**A. The Court Will Apply Pennsylvania Law.**

The parties agree that Pennsylvania substantive law applies. For that reason, the Court will apply Pennsylvania law in evaluating Defendants' Motion for Summary Judgment. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938); *see also Guar. Trust Co. v. York*, 326 U.S. 99, 108 (1945).

**B. Causation Standard**

Before imposing liability on a defendant in a product liability action, Pennsylvania law requires a plaintiff to show not only that the plaintiff was exposed to a defective product manufactured or sold by the defendant but that the plaintiff's exposure was a substantial factor in

causing the plaintiff's injury. *Richards v. Raymark Indus. Inc.*, 660 F. Supp. 599 (E.D. Pa. 1987); *Gregg v. V-J Auto Parts Co.*, 943 A.2d 216, 224–26 (Pa. 2007); *accord Robertson v. Allied Signal Inc.*, 914 F.2d 360, 375 (3rd Cir. 1990) (applying Pennsylvania law). The Pennsylvania Supreme Court held in asbestos litigation that "it is appropriate for courts, at the summary judgment stage, to make a reasoned assessment concerning whether, in the light of the evidence concerning frequency, regularity, and proximity of a plaintiff's or decedent's asserted exposure, a jury would be entitled to make the necessary inference of a sufficient causal connection between defendant's product and the asserted injury." *Gregg*, 943 A.2d at 226–27 (adopting the frequency, regularity and proximity standard in asbestos cases). As a result, a plaintiff must prove he was exposed to asbestos from a defendant's product with sufficient frequency, regularity and proximity so that a jury could make the necessary inference of an adequate causal connection between that product and the asserted injury. *Id.* at 227.

As for proximity, a plaintiff cannot merely show that the product was present at the plaintiff's workplace; he must present evidence to establish that the plaintiff inhaled asbestos fibers of the specific product of a manufacturer. *Kardos v. Armstrong Pumps, Inc.*, 222 A.3d 393, 399 (Pa. Super. 2019); *Gutteridge v. A.P. Green Services, Inc.*, 804 A.2d 643, 652 (Pa. Super. 2002), *appeal denied*, 829 A.2d 1158 (2003).

V. **ANALYSIS**

Defendants move for summary judgment because they are not liable for injuries caused by asbestos products because Plaintiff did not properly identify their products. (ECF No. 871, p. 2). Defendants argue that Plaintiff failed to produce sufficient evidence to satisfy her burden of showing that Mr. Gay was exposed to asbestos fibers of any product manufactured, distributed or supplied by Defendants. (*Id.*).

"At the heart of an asbestos case is at least product identification—that is, a plaintiff cannot triumph against a manufacturer unless he shows that the victim came across the manufacturer's product and that the product caused his injury." *Mehnert v. Agilent Techs., Inc.*, No. CV 18-893, 2020 WL 1493542 (W.D. Pa. Mar. 27, 2020) (quoting *Walker v. Blackmer Pump Co.*, 367 F. Supp. 3d 360, 372 (E.D. Pa. 2019)). Such an inquiry is "fact-intensive." *Id.*

For Plaintiff to defeat Defendants' Motion for Summary Judgment, Plaintiff must show not only that Mr. Gay was exposed to asbestos-containing products with sufficient proximity, regularity and frequency to cause his injuries but also that the asbestos products to which Plaintiff claims exposure were manufactured, distributed or sold by Defendants. *Eckenrod v. GAF Corp.*, 544 A.2d 50, 53 (Pa. Super. 1988); *see also Wilson v. A.P. Green Indus.*, 807 A.2d 922, 924 (Pa. Super. 2002) ("Ideally, a plaintiff or a witness will be able to directly testify that plaintiff breathed in asbestos fibers and that those fivers came from defendant's product."). The Court has a "duty to prevent questions from going to the jury which would require it to reach a verdict based on conjecture, surmise, guess or speculation." *Krauss v. Trane*, 104 A.3d 556, 568 (Pa. Super. 2014) (citation omitted).

### A. Defendants' Motion for Summary Judgment Is Granted Regarding Mr. Gay's Exposure at the Limerick Power Station.

Defendants argue that Plaintiff did not supply evidence that Mr. Gay worked around asbestos-containing products at the Limerick Power Station. Mr. Gay's duties at Limerick included reinspecting one unit of the power station in 1987 for four or five months. (ECF No. 979-1, pp. 7–8). The plant was not operational, and no other contractors were present while Stone & Webster was there. (*Id.* at 9–10). His job was to inspect portions of the HVAC system as well as piping to ensure that the installations conformed to the blueprints. (*Id.* at 11–12). Any insulation, if it had been disturbed, was removed before he was present. (*Id.*). He had no information on

whether the insulation or piping insulation contained asbestos. (*Id.* at 14). He testified that there was never an instance when anything was disassembled at Limerick for him to do his job. (*Id.*).

Plaintiff failed to offer other evidence that Mr. Gay was exposed to asbestos-containing products at the Limerick Power Station. Plaintiff did not prove that any materials Mr. Gay encountered contained asbestos. Even if any of the materials contained asbestos, Plaintiff did not show Mr. Gay was near asbestos-containing products with sufficient frequency, regularity and proximity. For these reasons, the Court grants Defendants' Motion for Summary Judgment as for all counts related to the Limerick Power Station.

### B. Defendants' Motion for Summary Judgment Will Be Denied Regarding Mr. Gay's Exposure at the Nine Mile Power Plant.

Defendants argue Plaintiff's evidence does not show Mr. Gay was exposed to asbestos at the Nine Mile Power Plant. Mr. Gay testified during his deposition that he believed he had been exposed to asbestos from gaskets. (ECF No. 979-1, pp. 4–6). He did not work hands-on with these gaskets and did not recall any specific instance when he was near another working with these gaskets. (*Id.*). Mr. Gay identified that he was near workers installing Flexitallic gaskets at some point and that he was within six feet of those installing the gaskets. Through unrelated depositions, Plaintiff showed that Flexitallic used asbestos in its gaskets until 1992. The record remains unclear whether Mr. Gay was exposed to Flexitallic with sufficient frequency or regularity. Because a genuine issue of material fact remains, Defendants' Motion for Summary Judgment as for Mr. Gay's potential asbestos exposure at the Nine Mile Plant is denied.

Although the Defendants are not product manufacturers, Mr. Gay identified potential asbestos exposure at the Nine Mile Power Plant, which one of the Exelon companies controlled. Because he was able to do so, Defendants may be liable for the exposure under other theories. Defendants did not waive their right to protect themselves under premise defendant theories. (ECF

No. 908, p. 1). From this point forward, the Court will narrow its focus on Defendants and Mr. Gay's alleged exposure to asbestos-containing products at the Nine Mile Power Plan.

**VI.     Conclusion**

The Court finds that some genuine issues of material fact remain. As a result, Defendants' Motion for Summary Judgment is granted in part and denied. An Order of Court will follow.

BY THE COURT:

_____
WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

_6.17.21_____
Dated