IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALLISA D. GAY,<br><br>    *Plaintiff,*<br><br>v.<br><br>A.O. SMITH CORPORATION, *et al.*,<br><br>    *Defendants.* | Civil Action No. 2:19-cv-1311<br><br>Hon. William S. Stickman IV |

**MEMORANDUM OPINION**

WILLIAM S. STICKMAN IV, United States District Judge

  Plaintiff Allisa D. Gay ("Plaintiff") sued Defendant Square D Co., n/k/a Schneider Electric USA, Inc. ("Schneider"), and various manufacturers and distributors on October 8, 2019 in the Court of Common Pleas of Allegheny County, Pennsylvania and alleged that Decedent Carl E. Gay ("Decedent") developed mesothelioma from exposure to Defendant's asbestos-containing products. On October 11, 2019, Defendant General Electric Co. filed a Notice of Removal to the United States District Court for the Western District of Pennsylvania under 28 U.S.C. § 1446. Before the Court is Schneider's Motion for Summary Judgment. (ECF No. 909). The Court must determine whether Plaintiff has properly identified Schneider's products as a cause of Mr. Gay's disease and, ultimately, death. For the following reasons, Schneider's Motion is granted.

**I.  Background**

  This case involves an alleged asbestos-related injury because of Mr. Gay's employment in the United States Navy from 1946 to 1958, the United States Air Force from 1958 to 1967, General Electric Co. from 1967 to 1974, Stone and Webster from 1974 to 1989 and from his automotive

1

work starting in the 1940s. (*See* ECF Nos. 1-1; 1-2). Mr. Gay was diagnosed with mesothelioma in June 2019. (ECF No. 1-15, ¶ 165; ECF No. 675).

Mr. Gay was deposed over nine days—November 5–7, 11–13, 21–22, 25, 2019—and identified various manufacturers, suppliers and users of asbestos products. Mr. Gay died on April 12, 2020. (ECF No. 1-15, ¶ 165; ECF No. 675). His daughter, Allisa D. Gay, was named executor of her father's estate and filed an Amended Complaint on August 13, 2020. (ECF No. 692). Allisa Gay was substituted as Plaintiff. (*Id.*).

## II. Relevant Facts

Plaintiff alleges that Mr. Gay developed mesothelioma from exposure to Defendant's asbestos-containing products while working the Beaver Valley Power Station in Shippingport, Pennsylvania. Plaintiff alleges Mr. Gay was exposed to asbestos from contractors working on Schneider's electrical boxes.

Mr. Gay testified that he worked for Stone & Webster at the Beaver Valley Power Station from 1974 to 1976. During his time at the plant, he worked throughout the entire facility. He was near construction workers who installed new equipment. He recalled Square D electrical components, as the brand and names were printed on the equipment. He observed workers manipulating the materials, which caused dust that he breathed.

```
                                    117
        11      Q. Did you work around employees of Schneider
        12          when you were at Beaver Valley?
        13      A. We worked around the employees of everybody
        14          that was there.
        15      Q. What kind of work did their employees do
        16          when you were around them?
        17      A. Schneider's?
        18      Q. Uh-huh.
        19      A. Everything from insulation of switchgear to
        20          pulling cables through conductors. That was always a
        21          big one for everybody. Wiring up pumps and motors.
```

| | |
|---|---|
| 22 | Q. Would you have worked around Schneider |
| 23 | employees who were doing all of that kind of work? |
| 24 | A. You were around them from time to time. |

118

| | |
|---|---|
| 1 | Q. Do you associate— |
| 2 | A. In fact, when I say pulling cables through |
| 3 | conduit, that is one of the inspection points for |
| 4 | quality control of watts. You're only allowed so much |
| 5 | pressure from pounds per square inch to pull the cables |
| 6 | through. What happens if you overstress the cables, it |
| 7 | will weaken the insulation so that you could have an arc |
| 8 | from the—through the insulation to the conduit. So |
| 9 | we'd watch that. You can—they can only pull it a |
| 10 | certain angle when they were pulling it. |
| 11 | Q. So you would observe them as they were |
| 12 | pulling cables through conduits and cable trays? |
| 13 | A. Mainly through conduit. |
| 14 | Q. Okay. |
| 15 | A. Not cable trays. |
| 16 | Q. Okay. Did you—you said that the |
| 17 | Schneider employees installed switchgear? |
| 18 | A. I believe they did. |
| 19 | Q. Do you recall any manufacturers of the |
| 20 | switchgear that was installed at Beaver Valley? |
| 21 | A. I think there was General Electric, but it |
| 22 | seemed like Square D was also there. |
| 23 | Q. How do you associate those names with the |
| 24 | switchgear? |

119

| | |
|---|---|
| 1 | A. By the nameplates on it. |
| 2 | Q. What was the purpose of the switchgear? |
| 3 | A. Control the equipment. |
| 4 | Q. Where was the switchgear located? |
| 5 | A. All over the plant. |
| 6 | Q. Okay. And during the installation process, |
| 7 | how close would you be from time to time to workers who |
| 8 | were installing the switchgear? |
| 9 | A. Sometimes you walked right by them. |
| 10 | Sometimes you had a little inspection to do right close |
| 11 | to them. But not assisting them or doing anything else. |
| 12 | It was just as a—your job was—you're doing your |
| 13 | job, they're doing theirs, and sometimes the two got |
| 14 | kind of close together. |

(ECF No. 941-2, pp. 2–3). Mr. Gay discussed his recollections of the Square D electrical components.

137

| | |
|---|---|
| 12 | Q. How did you know that the switchgear was |
| 13 | manufactured by Square D? |
| 14 | A. As I remember it, it had Square D written on |
| 15 | it. |
| 16 | Q. How was it written on there? |
| 17 | A. If I remember correctly, it was just a |
| 18 | big—just Square D. |
| 19 | Q. Okay. Was the writing in a particular |
| 20 | color? |
| 21 | A. I don't remember. I would say black |
| 22 | offhand, but I don't remember. |
| 23 | Q. But you're not sure? |
| 24 | A. Right. |

138

| | |
|---|---|
| 1 | Q. What color was the switchgear itself? |
| 2 | A. Gray, I believe. |
| 3 | Q. And how big was the Square D switchgear? |
| 4 | A. Pretty large. |
| 5 | Q. Are you able to be more specific? |
| 6 | A. Some of them, probably as big as this table. |
| 7 | That's, what, 2 foot by 6 foot, 8 foot, something like |
| 8 | that. |
| 9 | Q. Okay. Do you remember how many Square D |
| 10 | switchgear there were at that facility? |
| 11 | A. No, ma'am. |
| 12 | Q. Okay. Are you able to tell me what |
| 13 | percentage of the switchgear at Beaver Valley were |
| 14 | Square D as opposed to another manufacturer? |
| 15 | A. No. |
| 16 | Q. Can you tell me where any of the Square D |
| 17 | switchgear was located? |
| 18 | A. I'm trying to remember the area that it was |
| 19 | in, and I can't—no, ma'am. At this time, I cannot. |
| 20 | Q. Okay. What was the switchgear used for? |
| 21 | A. I have no idea. Switchgear is used for many |
| 22 | things. |
| 23 | Q. And you didn't know the specific details of |
| 24 | it? |

139

| | |
|---|---|
| 1 | A. Right. |
| 2 | Q. Was the switchgear enclosed in a metal box? |
| 3 | A. Yes. |
| 4 | Q. Did the box have a door on it? |
| 5 | A. I believe that they opened. In fact, I'm |
| 6 | not too sure that they weren't open in the back. |

```
7      Q. Okay. You were never responsible for
8         ordering any Square D switchgear, correct?
9      A. I was never responsible for ordering
10        anything as quality control.
11     Q. And you never saw the original packaging for
12        the Square D switchgear?
13     A. I did not.
14     Q. You never saw any manuals associated with
15        the Square D switchgear?
16     A. I did not.
17     Q. Did you know when any of the Square D
18        switchgear were installed?
19     A. No.
20     Q. Would it be fair to say you don't know the
21        maintenance history of any of the Square D switchgear?
22     A. I would say that it didn't have a
23        maintenance history.
24     Q. And is that because they would have just
                           140
1         been replaced rather than fixed if there was a problem
2         with them?
3      A. No, because it was a new plant, and it had
4         just been installed. The plant had never been
5         operational at that time, so there would be no real
6         reason for replacing them.
7      Q. Okay. And I think you told us it was never
8         your job to work on the switchgear, correct?
9      A. It was never my job to work on any of the
10        equipment, whatever. It was only my job to observe the
11        equipment to make sure that what had been—was on the
12        blueprints matched what had been installed.
```

(ECF No. 941-3, pp. 2–3).

Plaintiff presented the deposition of James Daugherty from an unrelated case. Mr. Daugherty began work at Duquesne Light Co. in 1976. In 1978, he became familiar with Unit 1 of the Beaver Valley Power Station where Mr. Gay once worked. Mr. Daugherty identified Square D as a common brand at the Beaver Valley Power Station. (ECF No. 941-5, pp. 8–9).

Plaintiff also presented the deposition of William Pratt, a corporate representative for Square D in previous asbestos litigation. Square D created equipment that contained asbestos from the 1930s through the 1980s. (ECF No. 941-6).

Plaintiff also presented the report of Frank Parker, CIH, who discussed risks associated with manipulating electrical switchgears and found asbestos exposure could be increased by "blowing down" circuit breakers. (ECF No. 941-7).

**III. Standard of Review**

Summary judgment is warranted if the Court is satisfied that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 322 (1986). A fact is material if it must be decided to resolve the substantive claim or defense to which the motion is directed. In other words, there is a genuine dispute of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must view the evidence presented in the light most favorable to the nonmoving party. *Id.* at 255. It refrains from making credibility determinations or weighing evidence. *Id.* "Real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof" will defeat a motion for summary judgment. *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007).

**IV. Applicable Law**

**A. Pennsylvania Law Applies**

The parties agree that Pennsylvania substantive law applies. For that reason, the Court will apply Pennsylvania law. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938); *see also Guar. Trust Co. v. York*, 326 U.S. 99, 108 (1945).

**B. Causation Standard**

Before imposing liability on a defendant in a product liability action, Pennsylvania law requires a plaintiff to show not only that the plaintiff was exposed to a defective product manufactured or sold by the defendant but that the plaintiff's exposure was a substantial factor in

6

causing the plaintiff's injury. *Richards v. Raymark Indus. Inc.*, 660 F. Supp. 599 (E.D. Pa. 1987); *Gregg v. V-J Auto Parts Co.*, 943 A.2d 216, 224–26 (Pa. 2007); *accord Robertson v. Allied Signal Inc.*, 914 F.2d 360, 375 (3rd Cir. 1990) (applying Pennsylvania law). The Pennsylvania Supreme Court held in asbestos litigation that "it is appropriate for courts, at the summary judgment stage, to make a reasoned assessment concerning whether, in the light of the evidence concerning frequency, regularity, and proximity of a plaintiff's/decedent's asserted exposure, a jury would be entitled to make the necessary inference of a sufficient causal connection between defendant's product and the asserted injury." *Gregg*, 943 A.2d at 226–27 (adopting the frequency, regularity and proximity standard in asbestos cases). As a result, a plaintiff must prove he was exposed to asbestos from a defendant's product with sufficient frequency, regularity and proximity so that a jury could make the necessary inference of an adequate causal connection between that product and the asserted injury. *Id.* at 227.

As for proximity, a plaintiff cannot merely show that the product was present at the plaintiff's workplace; he must present evidence to establish that the plaintiff inhaled asbestos fibers of the specific product of a manufacturer. *Kardos v. Armstrong Pumps, Inc.*, 222 A.3d 393, 399 (Pa. Super. 2019); *Gutteridge v. A.P. Green Services, Inc.*, 804 A.2d 643, 652 (Pa. Super. 2002), *appeal denied*, 829 A.2d 1158 (2003).

V. **ANALYSIS**

Defendant moves for summary judgment because it is not liable for injuries caused by asbestos products. Defendant highlights that Plaintiff does not name any specific Square D products and thus cannot show that any of the products contained asbestos. Plaintiff, therefore, cannot show that Mr. Gay was exposed to asbestos fibers of any product manufactured, distributed or supplied by Square D on a regular, frequent or proximate basis.

7

"At the heart of an asbestos case is at least product identification—that is, a plaintiff cannot triumph against a manufacturer unless he shows that the victim came across the manufacturer's product and that the product caused his injury." *Mehnert v. Agilent Techs., Inc.*, No. CV 18-893, 2020 WL 1493542 (W.D. Pa. Mar. 27, 2020) (quoting *Walker v. Blackmer Pump Co.*, 367 F. Supp. 3d 360, 372 (E.D. Pa. 2019)). Such an inquiry is "fact-intensive." *Id.*

For Plaintiff to defeat Defendant's Motion for Summary Judgment, Plaintiff must show not only that Mr. Gay was exposed to asbestos-containing products with sufficient proximity, regularity and frequency to cause his injuries but also that the asbestos products to which Plaintiff claims exposure were manufactured, distributed or sold by Defendant. *Eckenrod*, 544 A.2d at 53; *see also Wilson v. A.P. Green Indus.*, 807 A.2d 922, 924 (Pa. Super. 2002) ("Ideally, a plaintiff or a witness will be able to directly testify that plaintiff breathed in asbestos fibers and that those fivers came from defendant's product."). The Court has a "duty to prevent questions from going to the jury which would require it to reach a verdict based on conjecture, surmise, guess or speculation." *Krauss v. Trane*, 104 A.3d 556, 568 (Pa. Super. 2014) (citation omitted).

A plaintiff must identify a product at issue and prove that the product was defective and caused the plaintiff's injury. *See Eckenrod*, 544, A.2d at 52. Plaintiff only recalled Square D boxes around the Beaver Valley Power Station. He did not remember what they were used for other than that he recalled their being present and that other contractors sometimes worked on them. He merely identified Square D switchgears, a broad class of electrical components. Mr. Gay did not identify any internal components of the switchgear or actual electrical products. Mr. Gay admitted that he did not know for what purpose the switchgears were used. (ECF No. 910-1, p. 10). Mr. Gay never directly handled the switchgears but monitored others who worked on them. (*Id.*).

8

Plaintiff argues that the switchgear most likely had asbestos because Square D sold products with asbestos. Plaintiff alleges the presence of asbestos in some, but not all, Square D products generally. An argument that the use of asbestos in a product renders the product unsafe is not supported by evidence in the record or by case law. *See Estate of Hicks v. Dana Companies, LLC*, 984 A.2d 943, 968 (Pa. Super. 2009) (holding, in the context of asbestos injuries, the feature that renders the product unsafe is the danger from the inhalation of asbestos fibers that can be emitted from the product, not the presence of asbestos alone). The Court finds that, although Plaintiff established potential frequency, regularity and proximity to Square D products, she has not shown that the particular Square D products in question contained asbestos. Therefore, Plaintiff cannot show that Mr. Gay's mesothelioma was caused by asbestos from Square D's products.

## VI. Conclusion

The Court finds that a genuine issue of material fact does not exist in this case. As a result, Defendant's Motion for Summary Judgment is granted. Orders of Court will follow.

BY THE COURT:

_____
WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

6-7-21
Dated

9